Gerald GRANT, Appellant,

v.

STOP–N–GO MARKET OF TEXAS, INC., Appellee.

No. 01–96–01296–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 3, 1999.

Gordon R. Cooper, II, Houston, for Appellant.

Vance Christopher, Houston, for Appellee.

Panel consists of Justices O'CONNOR, HEDGES, and ANDELL.

## OPINION

MICHOL O'CONNOR, Justice.

Gerald Grant, the appellant, sued Stop–N–Go Market of Texas, Inc., the appellee, for false imprisonment and defamation. The trial court granted summary judgment in favor of Stop–N–Go. We reverse and remand to the trial court for further proceedings.

### A. Standard of Review

Summary judgment is proper only when a movant establishes there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Marchal v. Webb*, 859 S.W.2d 408, 412 (Tex.App.—Houston [1st Dist.] 1993, writ denied). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action. *Johnson*, 891 S.W.2d at 644; *Marchal*, 859 S.W.2d at 412. Thus, Stop–N–Go was entitled to summary judgment if it disproved as a matter of law any element of each of Grant's causes of action. Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant. *Id.* The nonmovant must respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979); *Marchal*, 859 S.W.2d at 412.

In reviewing the summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Johnson*, 891 S.W.2d at 644; *Marchal*, 859 S.W.2d at 412. We will assume all the evidence favorable to the nonmovant is true. *Johnson*, 891 S.W.2d at 644; *Thompson v. Vinson & Elkins*, 859 S.W.2d 617, 619 (Tex.App.—Houston [1st Dist.] 1993, writ denied). On appeal, we cannot consider any ground for reversal that was not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. *Clear Creek Basin Auth.*, 589 S.W.2d at 677; *Hussong v. Schwan's Sales Enter., Inc.*, 896 S.W.2d 320, 323 (Tex.App.—Houston [1st Dist.] 1995, no writ). We will affirm the summary judgment if any of the theories advanced in the motion for summary judgment is meritorious. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *Cigna Ins. Co. v. Rubalcada*, 960 S.W.2d 408, 411 (Tex.App.—Houston [1st Dist.] 1998, no writ).

### B. False Imprisonment

In point of error one, Grant claims the trial court erred in granting the motion because there are genuine issues of material fact regarding each element of the false imprisonment claim. The elements of false imprisonment are (1) a willful detention, (2) without consent, and (3) without authority of law. *Johnson*, 891 S.W.2d at 644–45. Stop–N–Go argues it negated the first two elements of Grant's claim because it established Grant was not wilfully detained without his consent. Stop–N–Go argues Grant chose to remain in the store, and he could have left if he so desired. In the alternative, Stop–N–Go argues it negated the third element of a false imprisonment claim because its actions were authorized by law under Chapter 124 of the Civil Practice and Remedies Code.

#### 1. The Summary Judgment Evidence

As evidence to support its motion, Stop–N–Go presented the trial court with an affidavit from Gerald Calhoun, the store manager, and excerpts from Grant's deposition. Grant responded to Stop–N–Go's motion for summary judgment with excerpts from his deposition, Stop–N–Go's responses to interrogatories, the police report, and Stop–N–Go's response to a request for production. The summary judgment evidence is summarized as follows.

### a. *Grant's Deposition Testimony*

In his deposition, Grant said he went to the Stop–N–Go store with his girlfriend. His girlfriend stayed in the car, which was parked in front of the door to the store. Grant paid for a can of beer, and then decided he wanted to buy some potato chips. He left the bag with the can of beer on the counter, and picked out two bags of potato chips which were marked on sale, two for 99 cents. Grant returned to the clerk and laid both bags of potato chips on the counter along with a one dollar bill.

The store clerk rang up the chips at 69 cents each. Grant told the clerk that the chips were on sale. The store clerk said something to Grant, but Grant did not understand what was said because the clerk spoke with a heavy foreign accent. The store clerk and Grant went back to the chip display. The clerk told Grant that the chips he selected were not on sale, but that another brand was on sale. Although Grant thought the clerk was wrong, he decided to buy the brand that the clerk said was on sale because he was in a hurry.

As the clerk began to total the price for the two bags of chips, Grant noticed someone leaning through the window of his car and apparently talking to his girlfriend. The appellant became concerned for his girlfriend because he did not recognize the person. He went to the door to make sure she was alright. As Grant walked to the door, he picked up the one dollar bill which he had previously laid on the counter. Grant opened the door to the store with his right hand and held the dollar bill in his left hand. After determining that the person leaning on his car was an acquaintance, Grant returned to the counter, paid for the two bags of chips, and began to walk out of the store. As he walked away from the counter, Grant told the clerk that he (the clerk) needed to learn his job better, a reference to the verbal altercation concerning the price of the chips.

Just as Grant reached the door, the store manager, Calhoun, came from the back of the store, grabbed him by the arm, and said words to the effect, "he (the clerk) is doing his job well, let's talk about the cigarettes that you stole." Grant said he was pulled back when Calhoun grabbed his arm. When Calhoun made the accusation against Grant, his voice was loud enough that all the patrons in the store heard what he was saying. Calhoun said words to the effect, "everything was on a surveillance videotape and there is nothing to talk about."

Grant said Calhoun went behind the counter and asked the store clerk three times what it was that Grant had stolen. The clerk did not respond until Calhoun asked if a pack of cigarettes was on the counter, to which the clerk responded affirmatively. Calhoun repeated his accusation that Grant stole a pack of cigarettes and passed them through the door.

Grant tried to explain to Calhoun that he did not steal any cigarettes. Grant said Calhoun told him to shut up. Grant said he got real quiet after Calhoun told him to shut up because he was afraid. After Calhoun grabbed him and accused him of stealing, Grant felt he could not leave. He thought if he did leave, the police would come looking for him.

### b. *Calhoun's Affidavit*

In his affidavit, Calhoun said he was in the back room of the store where a monitor for the store's surveillance camera was located. On the monitor, he saw Grant pick up something from the counter which

appeared to him to be a pack of cigarettes. Calhoun said Grant went to the door and stepped at least part way outside, while still holding the object in his hand. Calhoun said a car was parked directly in front of the door to the store. He then saw Grant return to the counter and complete his purchase. However, Calhoun did not see Grant return the item that he picked up from the counter.

Calhoun said he left the back room and approached Grant as he was leaving the store because, after watching the monitor, he believed Grant had passed a pack of cigarettes out the door. He put his hand on Grant's arm to get his attention, and then he asked Grant about the cigarettes he thought were stolen. Calhoun said his hand was only on Grant's arm for a few seconds because, as soon as Grant turned around, Calhoun quit touching his arm.

According to Calhoun's affidavit, Grant denied stealing any cigarettes. Calhoun thought Grant's attitude was hostile and somewhat threatening, and so he decided to call the police to investigate the matter. He said he feared a confrontation with Grant. Calhoun said that when he told Grant he was going to call the police, Grant responded by saying to go ahead and call the police.

The police arrived within 15 to 20 minutes. Calhoun said Grant and the officer viewed the surveillance video. He said Grant told the officer he had picked up a dollar before stepping out the door. Calhoun told the officer he thought the object Grant picked up looked like a pack of cigarettes. According to Calhoun, the officer said he would take Grant in, but Calhoun never asked or directed the officer to do so. Calhoun gave the officer the sur-

veillance video, and then the officer left the store with Grant.

Calhoun said he had no physical contact with Grant other than the initial touching to get Grant's attention. Once he got his attention, Calhoun said he and Grant remained on opposite sides of the counter while they waited for the police. Calhoun said a woman, perhaps Grant's girlfriend, came into the store and waited with Grant. Calhoun said nobody threatened Grant, nobody told Grant he could not leave, nobody prevented Grant from leaving, and nobody told Grant he was under arrest. According to Calhoun, Grant had a clear path to the door, nothing prevented Grant from leaving the store, Grant was never directed to remain in the store, and Grant was not put in or asked to go to a back room.

### c. The Surveillance Videotape

Grant claims the surveillance videotape is the best evidence to determine the reasonableness of Calhoun's belief that he stole cigarettes and of Calhoun's actions. However, Stop–N–Go did not produce it. Grant presented the trial court with the police report and Stop–N–Go's responses to discovery requests, which all address the location of the videotape.

The police report and the discovery requests are all inconsistent. The police report states the videotape was returned to Stop–N–Go. In a response to interrogatories, Stop–N–Go said the videotape was at the corporate office of the Risk Management Department of National Convenience Stores. However, in a response to a request to produce the surveillance videotape, Stop–N–Go said, "none." During oral argument before this Court, Stop–N–Go said the tape was lost.[1]

---

1. In issue three, Grant argues the trial court erred in granting summary judgment because it should have presumed the missing videotape was unfavorable to Stop–N–Go. Stop–N–Go argues Grant was not entitled to this presumption because he has not shown the videotape was intentionally destroyed. Although we need not decide this issue (we sustain issues one and two), we note that

Grant may be entitled to a jury instruction on this presumption. See Trevino v. Ortega, 969 S.W.2d 950, 953 (Tex.1998) (explaining the trial court has the discretion to allow a jury instruction or sanction parties for spoliation of evidence); Watson v. Brazos Elec. Power Co-op., Inc., 918 S.W.2d 639, 643 (Tex.App.—Waco 1996, writ denied) (stating the presumption arises whenever the party not in

### d. The Police Report

In the police report, Officer Anderson said when he walked into the Stop–N–Go store, Calhoun and Grant were arguing. Calhoun told the officer Grant stole a pack of cigarettes, and that it would be on the surveillance video. Anderson said he took Grant to the station to view the videotape. After reviewing the tape with Sergeant Hartley, Anderson determined the allegations against Grant were unfounded and released him. Anderson said the videotape was returned to Stop–N–Go.

### 2. Willful Detention Without Consent

■■■■ Stop–N–Go relies on Morales v. Lee, 668 S.W.2d 867, 869 (Tex.App.—San Antonio 1984, no writ), to argue that Grant was not willfully detained without his consent as a matter of law.[2] It argues Grant was not detained because he was not restrained from moving from one place to another. Although physical restraint is one way to establish a willful detention, it is not the only way. Johnson, 891 S.W.2d at 645. A willful detention may also be accomplished by violence, threats, or any other means that restrains a person from moving from one place to another. Id. When, as here, a plaintiff alleges the detention was effected by a threat, the plaintiff must demonstrate the threat was such as would inspire a just fear of injury to his person, reputation, or property. See id.

Grant met this burden with his summary judgment evidence that raised genuine issues of material fact. According to Grant, Calhoun told Grant he could not leave and that he (Calhoun) was calling the police. This contradicts Calhoun's affidavit, in which Calhoun said he did not tell Grant that he could not leave. This raises a genuine issue of material fact concerning whether Grant was detained, and whether he consented to stay in the store.

Stop–N–Go also argues that threats of future actions, such as to call the police, are not sufficient to constitute false imprisonment. However, Calhoun did more than threaten to call the police; he actually called the police. Grant said he was afraid of what was going to happen; he had never been in trouble with the police before. He was afraid to try and leave the store because Calhoun had already grabbed him and told him not to leave. Compare Johnson, 891 S.W.2d at 645 (finding no detention of employee based on fear of what would happen because no one tried to stop her from leaving, no one guarded her, and she was not threatened). Grant was afraid that if he left, he would be labeled a fugitive from justice, causing even more damage to his reputation.

Under Johnson, when we assume these facts are true, we conclude Grant raised fact issues concerning whether he was willfully detained without his consent.

### 3. The Shopkeeper's Privilege

In its motion for summary judgment, Stop–N–Go claimed its actions were authorized by law under Civil Practice and Remedies Code section 124.001, the shopkeeper's privilege. If this is true, then Stop–N–Go would have negated the third element of Grant's false imprisonment claim. Grant argues he raised genuine issues of material fact regarding whether Stop–N–Go established this privilege as a matter of law.

---

possession of the evidence has introduced evidence harmful to the party who had control of the evidence).

**2.** In Morales, the plaintiff was an employee at a doctor's office. 668 S.W.2d at 868. The doctor accused the plaintiff of stealing five dollars. When she denied it, he screamed, hollered, threatened her, and then fired her and told her to leave. Id. at 868–69. The plaintiff won on her false imprisonment claim in a jury trial. Id. at 868. The appellate court reversed because it found there was no evidence of false imprisonment. Id. at 869.

Morales is distinguishable. It involved a full trial, where all the evidence was developed; here, it was a summary judgment proceeding. In Morales, the defendant only threatened to call the police, whereas here, Stop–N–Go actually did call the police.

Stop–N–Go's only summary judgment evidence was from an interested witness, Calhoun. Calhoun's affidavit explains what Calhoun saw on the surveillance monitor. The videotape is the best evidence of what happened. However, Stop–N–Go has refused to produce the videotape, and each time Stop–N–Go was asked for it, it gave a different reason why it could not be produced.

■ The shopkeeper's privilege provides that a person who reasonably believes another person has stolen, or is attempting to steal property, is privileged to detain that person in a reasonable manner and for a reasonable time to investigate ownership of the property. Tex. Civ. Prac. & Rem.Code § 124.001; *Wal–Mart v. Resendez*, 962 S.W.2d 539, 540 (Tex.1998). Thus, there are three components to the shopkeeper's privilege: (1) a reasonable belief a person has stolen or is attempting to steal; (2) detention for a reasonable time; and (3) detention in a reasonable manner. *Id.* at 540.

Like the court in *Wal–Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 520 (Tex.App.—San Antonio 1996, writ denied), we are concerned with a false imprisonment arising out of a detention. *Odem* explained that the shopkeeper's privilege is limited in its application to false imprisonment claims arising from investigative detentions. 929 S.W.2d at 520. The test of liability is not based on the store patron's guilt or innocence, but instead on the reasonableness of the store's action under the circumstances; the trier of fact usually determines whether reasonable belief is established. *Id.* Whether Calhoun was reasonable in believing Grant had committed a theft, or reasonable in detaining Grant, is a question to be determined by the jury. *See id.*

Stop–N–Go relies on *Resendez* to argue that a ten to 15 minute detention is reasonable as a matter of law.[3] This is a true statement of the law in *Resendez*. *See* 962 S.W.2d at 540. While *Resendez* held a ten to 15 minute detention was reasonable as a matter of law, it so held, *"without deciding the outer parameters* of a permissible period of time under section 124.001." *Id.* (emphasis added).

*Resendez* does not support Stop–N–Go's position, because Grant was detained for more than ten to 15 minutes. According to Calhoun, the police arrived 15 to 20 minutes after they were called. Once the police arrived, they viewed the tape at the store, and then they took Grant to the police station and viewed the tape again. Grant said he spent approximately an hour in police custody. Thus, Grant's detention lasted for more than an hour and 20 minutes.

### 4. *Conclusion*

Stop–N–Go did not negate any element of Grant's false imprisonment claim as a matter of law, and Grant raised genuine issues of material fact on each element. Therefore, summary judgment on this claim was improper.

We sustain point of error one.

## C. **Defamation**

In point of error two, Grant claims the trial court erred in granting Stop–N–Go's motion for summary judgment because there are genuine issues of material fact regarding Grant's defamation claim. Grant makes two arguments: (1) the shopkeeper's privilege should not be applied to a defamation claim; and (2) Stop–N–Go is not entitled to a qualified privilege. We agree with both arguments.

### 1. *Shopkeeper's Privilege*

---

**3.** The Supreme Court reversed a jury's finding of false imprisonment, holding that Wal–Mart established as a matter of law that it detained its employee for a reasonable period of time, in a reasonable manner, and upon a reasonable belief that she had stolen merchandise. *Resendez*, 962 S.W.2d at 539–40. The only question for the court to consider was whether it was reasonable to believe the employee had stolen from the store. 962 S.W.2d at 540.

■ Stop–N–Go did not dispute that Calhoun made the defamatory statements against Grant. Instead, Stop–N–Go invoked the shopkeeper's privilege as a shield from liability for defamation. As explained in the previous section, the privilege allows a shopkeeper to detain an individual reasonably suspected of theft for a reasonable amount of time and in a reasonable manner to investigate ownership of the property. Tex. Civ. Prac. Remedies Code § 124.001; *Resendez*, 962 S.W.2d at 540. However, the shopkeeper's privilege does not apply to a defamation claim. *See Odem*, 929 S.W.2d at 520. Thus, Stop–N–Go cannot rely on this privilege to support summary judgment on Grant's defamation claim.

### 2. *Qualified Privilege*

■ Stop–N–Go claimed a qualified privilege to avoid liability for defamation, arguing that Calhoun's statement was made in connection with investigating a suspected theft. To be entitled to the qualified privilege, the person making the statement must make it in good faith on a subject matter in which the speaker has a common interest with the other person, or with reference to which the speaker has a duty to communicate to the other. *Johnson*, 891 S.W.2d at 646; *Galveston County Fair & Rodeo, Inc. v. Glover*, 880 S.W.2d 112, 120 (Tex.App.—Texarkana 1994, writ denied). The privilege applies as long as the communication passes *only* to persons having an interest or duty in the matter to which the communications relate. *Johnson*, 891 S.W.2d at 646.

■ The qualified privilege justifies the communication when it is made without actual malice. *Odem*, 929 S.W.2d at 525. The privilege is abused if the statement is made with actual malice—that is, it is made with knowledge of its falsity or with reckless disregard as to its truth. *Id.* The privilege is also abused if the person claiming it does not act for the purpose of protecting the common interest. *Hardwick v. Houston Lighting & Power Co.*, 881 S.W.2d 195, 199 (Tex.App.—Corpus Christi 1994, writ dism'd w.o.j.).

To invoke the privilege on summary judgment, Stop–N–Go was required to conclusively establish that the defamatory statement was made without malice. *See Johnson*, 891 S.W.2d at 646. Thus, Calhoun's statement would be qualifiedly privileged if it was made to the *clerk* in the process of investigating the suspected theft. However, Calhoun's accusations were made *publicly to Grant* in the store in front of several other patrons. He loudly accused Grant of being a thief.

That Grant was publicly accused (instead of privately questioned) is sufficient to prevent Stop–N–Go from invoking the qualified privilege. However, this is not the only reason why the qualified privilege does not apply in this case. Grant also raised a fact issue concerning whether Calhoun made the statements with actual malice. Grant contends that Calhoun made the statements with actual malice because he never questioned Grant or the clerk before he made the accusations. The clerk was in the best position to see whether Grant stole anything, and he did not accuse Grant of stealing until Calhoun questioned him about what was on the counter. Grant contends Calhoun made the false accusations in retaliation for the comments Grant made to the store clerk.

### 3. *Conclusion*

The shopkeeper's privilege does not protect Stop–N–Go from Grant's claim for defamation, and Stop–N–Go did not conclusively establish that it was entitled to a qualified privilege. Therefore, summary judgment was improper on the defamation claim.

We sustain point of error two.[4]

We reverse the trial court's judgment and remand to the trial court for further proceedings.

---

**4.** We need not reach issues three and four    because we sustain issues one and two.