# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00704-CV

**Allen Chadwick Burbage, Appellant**

**v.**

**W. Kirk Burbage and Burbage Funeral Home, Appellees**

**FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
NO. 26,976, HONORABLE TERRY L. FLENNIKEN, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Allen Chadwick Burbage ("Chad") appeals a judgment and permanent injunction entered in favor of W. Kirk Burbage and the Burbage Funeral Home (collectively, "Kirk"). Kirk sued his brother Chad for defamation on the basis of statements Chad made on a website and in letters to third parties. A jury awarded Kirk nearly $10,000,000 in compensatory and exemplary damages, and the trial court permanently enjoined Chad from publishing statements like those at issue in the suit. On appeal, Chad argues that we should reverse the judgment and remand for a new trial because (1) Kirk's attorney made improper jury arguments that resulted in incurable harm and (2) the letters Chad sent to third parties were protected by the common-interest privilege. Chad also argues that we should reverse the damages awards because they are unsupported by the evidence, excessive under the First and Fourteenth Amendments to the United States Constitution, and excessive under Texas statute. *See* Tex. Civ. Prac. & Rem. Code Ann. art. 41.008(b)

(West Supp. 2010). Finally, Chad argues that we should vacate the permanent injunction because it is an unconstitutional prior restraint on free speech. For the reasons explained below, we affirm the compensatory damages award, modify the exemplary damages award to comport with Texas's statutory cap, and vacate the permanent injunction.

**FACTUAL AND PROCEDURAL BACKGROUND**

Chad and Kirk Burbage are brothers with a long history of conflict. Their family has owned the Burbage Funeral Home, reportedly the oldest family-owned funeral home in the state of Maryland, for over two centuries. Chad and Kirk Burbage's grandmother, Anna Burbage, ran the funeral home for decades starting in the 1940s. When Anna Burbage died in 1985, she willed the funeral home to Kirk Burbage.

Chad came to believe that Kirk Burbage had secured this inheritance through untoward means. Chad also questioned his brother's acquisition of a quitclaim deed from their mother, Virginia Markham, for a half-interest in the family cemetery. The siblings clashed over these and many other matters. Their conflict came to a head after Kirk Burbage sold mausoleums in the family cemetery to Shirley and Brice Phillips, who were not members of the Burbage family.

In early 2008, Chad created a website, annaburbage.org, where he published many of his complaints about his brother's actions, including the following allegations:

- "Anna Burbage ('Miss Anna') was a victim of Elder Abuse. The Abuser was her grandson, Kirk Burbage and others."

- "Virginia Burbage Markham was the principal of Stephen Decatur High School serving Northern Worcester County Maryland. At the present time,

2

she is being abused by her son, Kirk Burbage, of the Burbage Funeral Home. She is currently a victim of ELDER as well as FAMILY ABUSE."

- "The methods [of abuse of Virginia Markham by Kirk Burbage] include: lies, trespassing, grand larceny, will tampering/undue influence, gifts with the intent to control his mother, discrediting fellow siblings, deceptively misrepresenting the contents of legal documents requiring the signature of the ABUSED for personal gain and to cover up land fraud and involving the ABUSED ELDER in Cemetery Land Fraud implicating several families including Shirley and Brice Phillips of the Phillips Crab House."

- "Kirk Burbage has also been known to abuse the dead, specifically his cousin, Anne Prettyman Jones."

Chad's website was operative for approximately four months.

Around the time that the website was operative, Chad wrote two letters to the Phillipses, the couple that had purchased mausoleums from his brother. Chad's letters included the following statements:

- "Kirk Burbage has committed numerous abuses to family members."

- "We are the victims of the selfish, greedy and unlawful actions of Kirk Burbage."

- "Kirk Burbage of the Burbage Funeral Home with the assistance of his attorney Robert McIntosh [has] fraudulently misrepresented rights which Kirk Burbage does not have."

- "Kirk Burbage fraudulently obtained a Quit Claim [deed] from our mother by what is believed to be elder abuse."

- "Kirk Burbage and the Burbage Funeral Home violated Maryland law by not having a license to operate a cemetery."

- "Kirk Burbage did commit fraud."

3

In April 2008, Kirk filed suit against Chad in Bastrop County, Texas (where Chad lived), alleging that the above statements from the website and the letters to the Phillipses were defamatory. The parties proceeded to trial, and the jury ultimately found in favor of Kirk on all issues. The jury awarded Kirk $3,802,000 in non-economic, compensatory damages:

- $300,000 for "Injury to reputation sustained in the past."

- $3,500,000 for "Injury to reputation that, in reasonable probability," Kirk "will sustain in the future."

- $1,000 for "Mental anguish sustained in the past."

- $1,000 for "Mental anguish that, in reasonable probability," Kirk "will sustain in the future."

The jury also awarded Kirk $5,800,000 in exemplary damages.

The trial court entered judgment on the jury's verdict. The court also permanently enjoined Chad from "publishing, disseminating or causing to be published or disseminated, whether directly or indirectly, to third-parties by any means, whether verbal or in writing, any statement or representation that states, implies or suggests in whole or in part" anything "of the same or similar nature as [the representations] at issue in this lawsuit." The permanent injunction includes a roughly four-page list of prohibited subjects.

Chad now appeals the judgment and the injunction.

## DISCUSSION

Chad makes four arguments on appeal:

4

1.    Kirk's attorney made improper, incurable jury arguments during trial that likely resulted in the rendition of an improper judgment;

2.    Chad's letters to the Phillipses were not defamatory because they were protected by the common-interest privilege, and Kirk failed to overcome the privilege with a showing of actual malice;

3.    the damages awards are unsupported by the evidence and excessive; and

4.    the permanent injunction is an unconstitutional prior restraint on free speech.

We will address these arguments in turn.

## 1. Improper Jury Arguments

In his first point, Chad argues that Kirk's attorney made improper, incurable jury arguments that likely influenced the jury to render judgment on an improper basis. Chad seems to concede that he did not preserve error with regard to Kirk's attorney's jury arguments. *See Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam) ("Error as to improper jury argument must ordinarily be preserved by a timely objection which is overruled."). As such, his appellate argument relies on the allegedly "incurable" nature of Kirk's attorney's arguments. *See id.* (noting that in rare instances where probable harm from jury argument was such that it could not be cured, appellant may complain about argument even if he did not object to it during trial).

"To prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not . . . eliminate the probability that it resulted in an improper verdict." *Id.* at 680-81. "The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was so extreme that a juror of

ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (internal quotation marks omitted). On this record, we are not persuaded that the arguments of which Chad complains rise to the level of creating reversible error.

Chad focuses on three jury arguments that he claims each represented incurable harm:

- Kirk's attorney repeatedly said that Chad had accused Kirk of "abusing corpses." Chad claims this to be a misrepresentation of what his website actually said, which was that Kirk had "been known to abuse the dead, specifically his cousin, Anne Prettyman Jones."

- Kirk's attorney exhorted the jury to "kick" Chad, taking the term "kick" from a videotaped deposition of Chad and Kirk's mother, Virginia Markham, that was played for the jury. In the deposition, Markham was asked what Anna Burbage would have thought of the statements on her grandson Chad's website. Markham responded, "I think she could kick [Chad] down the steps just as fast as she could kick him." In his closing argument, Kirk's attorney asked the jury to "kick" Chad the way Anna Burbage purportedly would have, to "leave a definable footprint" because that was "what Anna Burbage would have done."

- Kirk's attorney stated during closing argument that "Negotiating with Chad Burbage is like negotiating with a terrorist aiming a gun at your loved one."

Chad also cites several "epithets, personal attacks, and expressions of personal anger and animosity" that Kirk's attorney used. Kirk's attorney:

- twice accused Chad of lying while cross-examining him;

- called Chad a "bully," "sinister," and "cowardly," and accused him of extorting his family;

6

- likened Chad to a "vicious pit bull" who "latches on to your throat and rips out your jugular vein and leaves you for dead"; and

- stated that he was personally angry at Chad.

Chad contends that these statements collectively caused incurable harm. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839-40 (Tex. 1979) (noting that when determining whether improper arguments were incurable, we consider not only "nature, degree and extent of error," but also "whether there was cumulative error"). We will address Chad's complaints in turn.

Chad's initial complaint is that Kirk's attorney, during his opening statement, told the jury:

> [Chad] accused Kirk Burbage of abusing the dead. Those words were chosen very carefully by the way. Those words were chosen so that people who read it [sic] would assume that Kirk Burbage was doing something to the physical corpses of the loved ones who were entrusted to him. That's the death blow to a funeral home.

Kirk's attorney returned to this theme repeatedly throughout the trial. During closing argument, Kirk's attorney said:

> And most heinous of all, Chad Burbage has accused Kirk Burbage of abusing corpses. Make no mistake about that. Chad Burbage may have said in his website . . . that Kirk Burbage abuses the dead, but what he is accusing him of is abusing the deceased or the bodies of the deceased who were entrusted to him.

Kirk's attorney also said that (1) "Chad Burbage . . . created the annaburbage.org Web site in which he publicly accused Kirk Burbage of committing . . . abuse of corpses"; (2) "Chad Burbage has no personal knowledge and witnessed none of the incidents which he claims constitute . . .

7

abuse of corpses"; and (3) the "false accusations of . . . abuse of corpses have spread throughout the community."

Chad's argument relies on the distinction between what Chad said, i.e., that Kirk "has been known to abuse the dead," and Kirk's lawyer's characterization of the allegations as "abuse of corpses." Chad argues that the former has less sinister implications and that he accused Kirk of abusing only one dead person (his cousin, Anne Prettyman Jones), not "corps*es*" plural. During trial, Chad claimed that his statement that Kirk had been known to "abuse the dead" referred to an occasion when Kirk complained about his deceased cousin owing him money. Chad also argued during closing that "abuse of the dead" could refer to his and Kirk's dispute over the family cemetery or to "[b]urying people on land that is contested." On appeal, Chad argues that Kirk's claim that Chad accused him of "abuse of corpses" was both highly inflammatory and unsupported by the evidence.

After reviewing the entire record, we do not believe that Kirk's characterization of Chad's accusation as "abuse of corpses" rises to the level of an incurable jury argument. At the outset, we are not persuaded by Chad's argument accusing Kirk, a funeral director, of having "been known to abuse the dead," is more benign than or insufficient to support an inference that Chad was accusing Kirk of "abusing corpses." Even if we assume that the phrase "abuse of corpses" is somehow more inflammatory than alleging that a funeral director "abuse[d] the dead," Kirk's attorney clarified several times that he was not attributing the phrase "abuse of corpses" directly to Chad but rather was saying that the phrase was implied by Chad's words. The jury saw Chad's exact words and heard Chad's explanation of what he meant by "abuse the dead." The jury

8

was free to draw its own conclusions about what Chad's words meant or implied. Furthermore, the reasonableness of this interpretation of Chad's words was supported by testimony, as Kirk called a witness who had seen Chad's website while it was operative, and the witness testified that he interpreted the phrase "abuse the dead" to mean "abuse of corpses." On these facts, we cannot conclude that, "based on the record as a whole," Kirk's "abuse of corpses" references were "so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Bramlett*, 288 S.W.3d at 883.

Chad also argues that Kirk's attorney improperly exhorted the jury to "kick" Chad the way Anna Burbage purportedly would have, trying to "induce the jury to abandon their position as fair and impartial jurors and to assume the position of a partisan or claimant in the case." *World Wide Tire Co. v. Brown*, 644 S.W.2d 144, 146 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.) (citation omitted). Even if this were true, however, the harm caused by Kirk's attorney's exhortation would not have been incurable. *See id*. (holding that when plaintiff told jurors they should award him what they would want in his position, error "was not of such a nature that its harmful effect could not have been removed" by objection and instruction).

Chad also argues that "in today's post-9/11 political climate," Kirk's attorney caused incurable harm when he stated during closing argument that "[n]egotiating with Chad Burbage is like negotiating with a terrorist aiming a gun at your loved one." Chad fails to mention that this argument was followed with the statement "[negotiating with Chad] is a demand accompanied by a threat." The jury saw emails in which Chad threatened to publicize his accusations of abuse unless

9

Kirk agreed to renegotiate family-property disputes. Kirk's attorney did not say Chad *was* a terrorist, or even that Chad behaved generally like a terrorist; he said only that negotiating with Chad was "like" negotiating with a terrorist. In context, the "terrorist" comparison does not strike us as fundamentally compromising Chad's ability to get a fair trial. *See Penalver*, 256 S.W.3d at 680-81.

Chad argues, on the other hand, that "terrorist" comparisons necessarily result in incurable harm. In support of this position he cites *Showbiz Multimedia LLC v. Mountain State Mortg. Ctrs., Inc.*, 303 S.W.3d 769, 770 (Tex. App.—Houston [1st Dist.] 2009, no pet.). The *Showbiz Multimedia* court did indeed find incurable harm in defense counsel's statement that the plaintiff's lawsuit represented "judicial terrorism," *id.*, but it did so against a very different factual backdrop. The plaintiff in that case was a "South Asian-American," *id.*, and defense counsel coupled his statement about judicial terrorism with a statement, "wholly unsupported by the record, that a business associate of [the plaintiff's] felt 'scared to death of this man' due to 'cultural issues.'" *Id*. at 772. The appellate court thus characterized defense counsel's argument as making "improper appeals to race [and] nationalism," which the supreme court has specifically cited as forms of incurable argument. *See id*. Here, in contrast, the "terrorism" comment did not involve an appeal to race or nationalism.

Chad also cites *Mills v. State*, No. 07-08-00348-CR, 2009 WL 3320249, at *3 (Tex. App.—Amarillo Oct. 14, 2009, no pet.) (mem. op., not designated for publication), in support of the argument that "terrorist" comparisons necessarily cause incurable harm. *Mills* is distinguishable because it involved a prosecutor directly comparing a criminal defendant to 9/11 hijacker Muhammed Atta. *See id*. at *1. In the same breath, the prosecutor also compared

10

the defendant to serial killers John Wayne Gacy and Jeffrey Dahmer. *Id.* We think it obvious that, especially in the criminal context, such comparisons are far more egregious than a comment during a civil trial that negotiating with an opponent is "like" negotiating with a terrorist. In sum, we are not persuaded that the "terrorist" comment represented incurable harm. The comment was analogical, occurred only once, and was quickly clarified with an explanation that was arguably supported by the evidence. *Cf. Reese*, 584 S.W.2d at 839-40 (noting whether improper argument caused incurable harm depends on nature, degree and extent of error).

Finally, Chad complains about the personal epithets Kirk's attorney directed at him. He argues that these epithets collectively caused incurable harm, especially when coupled with the statements described above. Having reviewed the entirety of the record, we find that the complained-of epithets, while arguably inappropriate, do not rise to the level of creating incurable harm in light of the facts of this case.

In sum, we do not agree that Kirk's attorney's jury arguments were so extreme and unsupported as to represent incurable error. We overrule Chad's first issue.

## 2. Whether Chad's Letters to the Phillipses Were Protected by the Common-Interest Privilege

Chad's second point on appeal asserts that the trial court erred by allowing Kirk to recover damages for the statements Chad made in his letters to the Phillipses, who purchased a mausoleum site from Kirk. Chad argues that the statements cannot be defamatory because he had a "common interest" with the Phillipses, making his statements privileged.

A "common-interest" privilege is "granted to statements that occur under circumstances wherein any one of several persons having a common interest in a particular

11

subject matter may reasonably believe that facts exist that another, sharing that common interest, is entitled to know." *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 92 (Tex. App.—Dallas 1996, writ denied). A statement qualifies for the common-interest privilege only if it is made "for the purpose of protecting the common interest." *Grant v. Stop-N-Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 874 (Tex. App.—Houston [1st Dist.] 1999, no pet.). A statement that meets these criteria is presumed to have been made in good faith and without malice, meaning that it cannot support recovery in defamation unless the presumption of good faith is overcome. *See Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 630 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). A plaintiff may overcome the common-interest presumption of good faith with a showing of "actual malice," i.e., a showing that the statement was published "with knowledge of its falsity or with reckless disregard as to its truth." *Grant*, 994 S.W.2d at 874.

Chad argues that he shared a common interest with the Phillipses because Kirk had sold the Phillipses mausoleums in the Burbage family cemetery. Thus, argues Chad, he and the Phillipses shared an interest in ensuring that Kirk had not been selling rights to the family's cemetery land without legal authority.

At the outset of a common-interest analysis, we note that Chad's interest in keeping the Phillipses out of the family cemetery was antithetical to the Phillipses' interest in owning their cemetery spaces. But even if we assume that Chad is right about having a common interest with the Phillipses, at least some of his allegedly defamatory statements to the Phillipses were clearly not made "for the purpose of protecting the common interest." *See Grant*, 994 S.W.2d

12

at 874. Specifically, the following statements in Chad's letters have no arguable relation to Kirk's sale of mausoleums to the Phillipses:

- "Kirk Burbage has committed numerous abuses to family members."

- "Kirk Burbage fraudulently obtained a Quit Claim [deed] from our mother *by what is believed to be elder abuse*."

(Emphasis added.) Clearly, these statements (at a minimum) were not subject to the common-interest privilege. *See id.*

Chad argues that if even *some* of his statements to the Phillipses were protected by the common-interest privilege then we must reverse the judgment. He bases this argument on the fact that the trial court submitted broad-form damages questions to the jury rather than segregating the damages by statement. However, Chad did not object in the trial court to the submission of broad-form damages questions, so we cannot reverse on the basis that the broad-form damages questions may have included both valid and invalid grounds for recovery. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) (holding that complaints of error in broad-form submission must be preserved by objection at trial). Thus, even if we were inclined to find that some of Chad's statements were protected by the common-interest privilege, which we are not, the jury's broad-form findings would be well supported by other statements. We therefore overrule Chad's second appellate issue.

*3. Whether the Damages Awards are Unsupported by the Evidence and Excessive*

In his third issue, Chad argues that Kirk's non-economic, compensatory damages award was unsupported by the evidence and excessive under the First Amendment. He

13

also argues that Kirk's exemplary damages award was excessive under Texas statute and the Fourteenth Amendment. We will address the compensatory and exemplary damages awards separately.

### *Compensatory Damages*

Chad argues that the jury's award of roughly $3,800,000 in compensatory damages to Kirk was excessive and unreasonable because there was little evidence that Kirk's reputation was actually harmed or would continue to be harmed in the future. Specifically, Chad argues that there was no evidence as to how many people had viewed his website while it was operative, and the fact that the website was taken down long before trial meant that future reputational harm was especially unlikely. Chad argues that Kirk produced no evidence to substantiate that his reputation or business had actually been harmed by Chad's statements. While Kirk testified that a few customers canceled their prepaid funeral arrangements after Chad published his statements, Chad argues that Kirk produced no evidence to substantiate these cancellations or tie them directly to Chad's statements.

Chad contrasts the damages awarded to Kirk with those awarded to the plaintiff in *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). In *Bentley*, a judge sued a television personality who had broadcast several defamatory statements about the judge over a long period of time. *Id*. at 567-74. The judge presented significant evidence that the statements had been widely heard and had actually harmed his reputation. *Id*. at 570-73. A jury awarded him $175,000 in damages based on past and future reputational harm. *Id*. at 576.

Chad argues that in *Bentley* the harm was much better established than the harm here, yet the damages award was much smaller, suggesting that Kirk's compensatory damages award

14

was excessive. At issue in *Bentley*, though, was one public servant's reputation. Here, in contrast, the jury was presented with evidence that Chad's statements harmed the reputation not only of a private individual, but also of a well-established, long-running business with considerable goodwill built up in its community. As such, the damages awarded in *Bentley* do not necessarily guide the appropriate damages here.

Rather, in reviewing Kirk's compensatory damages award, we follow the general rule that the jury is afforded significant latitude in determining the proper measure of damages. *Id*. at 605. We review a damages award for whether it is excessive, unsupported by the evidence, or unreasonable. *Id*. at 605-06. There must be some evidence to justify the amount awarded, and that amount must "fairly and reasonably" compensate for the loss incurred. *Id*. at 606.

Having reviewed the entire record, we cannot say that Kirk's compensatory damages award is excessive or unreasonable. First, Kirk testified that Chad's defamatory accusations were "all over town." Second, Chad conceded that his accusations would "have significant repercussions on Kirk's business." Third, Kirk testified that the Burbage Funeral Home had a market value of at least $3 million and that this value would likely be lost because of Chad's statements. Chad complains that this testimony was not substantiated with documentary evidence, but no such requirement exists. Rather, the jury had latitude to use Kirk's testimony as a basis for calculating compensatory damages. We therefore hold that the jury's compensatory damages award to Kirk did not lack evidentiary support. *See id*. Chad also argues that the First Amendment to the United States Constitution prohibits "excessive noneconomic damages awards in defamation cases because they

15

threaten to inhibit constitutionally protected speech." Having just determined that the compensatory damages awarded here were not excessive, we find Chad's First Amendment argument unpersuasive.

### *Exemplary Damages*

#### *Texas Statute*

Chad argues that the jury's nearly $6 million exemplary damages award to Kirk is excessive under Texas law. We agree.

Texas Civil Practice and Remedies Code article 41.008(b) provides:

Exemplary damages awarded against a defendant may not exceed an amount equal

to the greater of:

(1)    (A) two times the amount of economic damages; plus
(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2)    $200,000.

Tex. Civ. Prac. & Rem. Code Ann. art. 41.008(b). Bearing in mind that no economic damages were awarded here, this statute plainly limits Kirk to $750,000 in exemplary damages.

Kirk argues that article 41.008(b) does not apply here because Chad did not invoke it in the trial court. But Chad's amended answer explicitly stated that "[i]f the Defendant is found liable for exemplary damages, those damages must be capped under the Texas Damages Act." We therefore modify the exemplary damages award to $750,000 to accord with Texas's statutory exemplary-damage cap.

16

***The Fourteenth Amendment***

Chad also argues that the exemplary damages award violates the Due Process Clause of the Fourteenth Amendment by its sheer size. It is true that an excessive exemplary damages award may deprive a litigant of due process. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 307-08 (Tex. 2006). "In reviewing the amount of an exemplary damage award for constitutionality, we have been directed to consider three 'guideposts': (1) the nature of the defendant's conduct, (2) the ratio between exemplary and compensatory damages, and (3) the size of civil penalties in comparable cases." *Id*. at 308.

These guideposts do not suggest that an exemplary damages award modified to $750,000 is unconstitutional. *Cf. id*. Regarding the first guidepost, the jury found that Chad maliciously and repeatedly published statements accusing his brother of heinous crimes knowing that his brother worked in an industry where reputation is paramount. *Cf. id*. (concluding that reprehensibility of defendant's conduct depends in part on whether defendant's conduct involved repeated acts, threatened financial ruin, and resulted from malice). Regarding the second guidepost, a $750,000 exemplary damages award is far less than the roughly $3,800,000 compensatory damages award that we have already determined not to be excessive. *Cf. id*. (suggesting that exemplary-to-compensatory-damages ratio of more than four to one probably unconstitutional). Regarding the third guidepost, Chad has not pointed us to a single case where, as here, defamatory statements threatened to harm a multi-million-dollar business. Thus, he has provided us no basis for concluding that a $750,000 exemplary damages award is incommensurate with the damages awards in "comparable" cases.

17

Chad also argues that Kirk's exemplary damages award violates the Fourteenth Amendment because it was based "in part upon [the jury's] desire to punish the defendant for harming persons who are not before the court." *Philip Morris USA v. Williams*, 549 U.S. 346, 349 (2007) (emphasis deleted). Specifically, Chad argues that the exemplary damages award was partially based on the jury's desire to punish Chad for harming his grandmother, Anna Burbage, who was not a party to the lawsuit. Chad notes that Kirk emphasized Anna Burbage's status, legacy, and reputation throughout the trial. This emphasis, however, also spoke directly to the harm done to the Burbage Funeral Home (which *was* a party to the lawsuit) because its community standing derived largely from its connection with Anna Burbage. We therefore see no basis for concluding that the emphasis on Anna Burbage's status, legacy, and reputation persuaded the jury to consider anything other than the harm to Kirk and the Burbage Funeral Home.

In sum, we agree with Chad that Kirk's exemplary damages award must be reduced to $750,000 to accord with Texas Civil Practice and Remedies Code article 41.008(b). Beyond that, we reject Chad's arguments that the jury's exemplary damages award was improper.

### Whether the Permanent Injunction is Unconstitutional

Finally, Chad argues that the permanent injunction imposed by the trial court represents an unconstitutional prior restraint on speech. The court simply signed without altering a proposed injunction that Kirk submitted. That injunction permanently enjoined Chad from "publishing, disseminating or causing to be published or disseminated, whether directly or indirectly, to third-parties by any means, whether verbal or in writing, any statement or representation that states, implies or suggests in whole or in part" anything "of the same or similar nature as [the

18

representations] at issue in this lawsuit." The permanent injunction includes a roughly four-page list of prohibited subjects. We agree with Chad that the injunction is unconstitutional.

A prior restraint is a "judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis deleted). Such orders are highly disfavored under federal law and even more highly disfavored under Texas law. *See Davenport v. Garcia*, 834 S.W.2d 4, 10 (Tex. 1992). Thus, defamatory speech is not sufficiently injurious to warrant prior restraint. *See, e.g.*, *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983) (per curiam) ("Defamation alone is not a sufficient justification for restraining an individual's right to speak freely."); *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 107 (Tex. App.—Austin 2003, no pet.) (concluding that harm resulting from defamation does not rise to level necessary to make prior restraint constitutional). We therefore vacate the permanent injunction entered by the trial court.

## CONCLUSION

For the reasons stated above, we affirm the compensatory damages award, modify the exemplary damages award to $750,000, and vacate the permanent injunction.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed in part; Modified and, as Modified, Affirmed in part; Vacated in part

Filed:   December 21, 2011

19