# IN THE SUPREME COURT OF TEXAS

══════════
No. 12-0563
══════════

ALLEN CHADWICK BURBAGE, PETITIONER AND CROSS-RESPONDENT,

v.

W. KIRK BURBAGE AND BURBAGE FUNERAL HOME,
RESPONDENTS AND CROSS-PETITIONERS

══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
══════════════════════════════════════════════

**Argued January 9, 2014**

JUSTICE GREEN delivered the opinion of the Court.

In this defamation case, a jury assessed compensatory and exemplary damages against Allen

Chadwick Burbage (Chad) for ten statements defaming his brother, W. Kirk Burbage (Kirk). The

trial court also permanently enjoined Chad from making similar statements. We are presented with

three issues: (1) whether any defamatory statements fell within a qualified privilege; (2) whether

evidence supports the jury's damage awards; and (3) whether the trial court abused its discretion by

issuing the permanent injunction. Because we hold that Chad failed to preserve error in the charge,

we do not reach the issue of qualified privilege. We also hold that the permanent injunction operates

as an impermissible prior restraint on freedom of speech. Accordingly, we affirm those parts of the

court of appeals' judgment. But, on damages, we hold that no evidence supports the compensatory damage award. We reverse that part of the court of appeals' judgment.

## I. Factual and Procedural Background

Kirk owns and operates the Burbage Funeral Home, a centuries-old family business, in Worcester County, Maryland. Chad is Kirk's older brother. Chad and Kirk's grandmother, Anna Burbage, managed the funeral home from her husband's death in the 1940s until her death in 1985. In her will, Anna left the funeral home and all of its assets to Kirk.

Anna bequeathed the land for the Burbage family cemetery to her children, Richard Burbage, Sr., Chad and Kirk's father, and Jean Burbage Prettyman. Although primarily a family cemetery, Anna and Richard gave permission for burial or entombment of several non-family members. Richard died in 1991; in his will, he left his 50% undivided interest in the family cemetery property to Chad and Kirk's mother, Virginia Burbage Markham, but the will was never probated. Virginia conveyed this interest to Kirk by quitclaim deed in 2003. Chad felt Kirk obtained the funeral home and the family cemetery interest through manipulation, first of Anna and later of Virginia.

Although the origin of the strife between Chad and Kirk remains unclear, the "Farm Property," a 23-acre tract that Virginia inherited from Richard in 1991, aggravated any existing discord. The potential sale of the property ultimately aligned Virginia's four children against each other: Chad and Patrice Burbage Lehmann wanted to sell, while Kirk and his brother, Keith, demurred. Throughout 2006 and 2007, Chad exchanged heated emails with Kirk's attorney. In late 2007 and early 2008, Chad created a website, www.annaburbage.org, to air his grievances with Kirk.

2

Chad placed several posters around town to publicize the website. The website contained the following allegations:

- "Anna Burbage ('Miss Anna') was a victim of Elder Abuse. The Abuser was her grandson, Kirk Burbage and others."

- "Virginia Burbage Markham was the principal of Stephen Decatur High School serving northern Worcester County Maryland. At the present time, she is being abused by her son, Kirk Burbage, of the Burbage Funeral Home. She is currently a victim of ELDER as well as FAMILY ABUSE."

- "The methods [of abuse] include: lies, trespassing, grand larceny, will tampering/undue influence, gifts with the intent to control his mother, discrediting fellow siblings, deceptively misrepresenting the contents of legal documents requiring the signature of the ABUSED for personal gain and to cover up land fraud and involving the ABUSED ELDER in Cemetery Land Fraud implicating several families including Shirley and Brice Phillips of the Phillips Crab House."

- "Kirk Burbage has also been known to abuse the dead, specifically his cousin, Anne Prettyman Jones."

Chad also sent letters to Shirley and Brice Phillips, family friends of the Burbages who had earlier obtained permission to place a mausoleum in the Burbage cemetery. The letters espoused a common interest in settling property rights to the cemetery but stated, "You currently have no title or right to be in the Burbage Family Cemetery." Chad made the following statements in the letters:

- "Kirk Burbage has committed numerous abuses to family members."

- "We are the victims of the selfish, greedy and unlawful actions of Kirk Burbage."

- "Kirk Burbage of the Burbage Funeral Home with the assistance of his attorney Robert McIntosh have fraudulently misrepresented rights which Kirk Burbage does not have . . . ."

3

- "Kirk Burbage fraudulently obtained a Quit Claim [deed] from our mother by what is believed to be elder abuse . . . ."

- "Kirk Burbage and the Burbage Funeral Home violated Maryland law by not having a license to operate a cemetery . . . ."

- "Kirk Burbage did commit fraud."

Kirk and the Burbage Funeral Home sued Chad for defamation in Bastrop County.[1] Chad appeared pro se. The trial court submitted ten questions—one for each of the statements reproduced above—asking the jury whether Chad had proven that the statements were substantially true. The jury answered "no" to all questions. The court also asked questions on compensatory and exemplary damages for Kirk and, separately, for the Burbage Funeral Home. The court instructed the jury that all statements were defamatory per se because each statement either leveled a criminal charge or tended to cause injury to the funeral home's business or to Kirk's profession. The jury awarded Kirk $6,552,000: $250,000 for past injury to reputation; $2,500,000 for future injury to reputation; $1,000 for past mental anguish; $1,000 for future mental anguish; and $3,800,000 in exemplary damages. The jury awarded the Burbage Funeral Home $3,050,000: $50,000 for past injury to reputation; $1,000,000 for future injury to reputation; and $2,000,000 in exemplary damages. The trial court also permanently enjoined Chad from future defamatory speech in a four-page list of prohibited topics (tied to the ten defamatory statements).

Chad appealed. The court of appeals reduced the exemplary damages to $750,000 under Texas Civil Practice and Remedies Code section 41.008(b), upheld the other damage awards, and

---

[1] Chad was a resident of Bastrop County, Texas at the time the lawsuit was filed. *See* TEX. CIV. PRAC. & REM. CODE § 15.017.

vacated the injunction. ___ S.W.3d ___, ___ (Tex. App.—Austin 2011, pet. granted) (mem. op.). Each party petitioned for review; we granted both petitions. 57 Tex. Sup. Ct. J. 53 (Nov. 22, 2013).

## II. Qualified Privilege and Charge Error

We first address Chad's contention that qualified privilege barred Kirk's recovery based on Chad's defamatory statements to the Phillipses. If Chad's statements were privileged, the jury's answers on damages would rest upon invalidly submitted theories of liability. We hold that, even if the privilege applied, Chad failed to preserve jury charge error on this point.

## A. Chad's Qualified Privilege Claim

The common law provides a qualified privilege against defamation liability when "communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication." *Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex. 1994). We have recognized that defamation actions necessarily inhibit free speech and, thus, the qualified privilege offers an additional safeguard, even in cases of private, non-political speech. *See id.* The privilege operates as an affirmative defense in the nature of confession and avoidance; the defendant bears the burden of proving privileged publication unless the plaintiff's petition affirmatively demonstrates privilege. *Denton Pub. Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex. 1970). If a defendant establishes the privilege, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice. *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898 (Tex. 1970). Actual malice, in the defamation context, means "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771, 772 (Tex. 1994) (per curiam). Qualified privilege

5

presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed. *Fitzjarrald v. Panhandle Pub. Co.*, 228 S.W.2d 499, 505 (Tex. 1950).

Of the ten statements that the trial court found defamatory per se, Chad made six of those statements in letters to the Phillipses, while four appeared on the web site or posters. Chad argues that a qualified privilege protects his communication with the Phillipses because both he and they had an interest "sufficiently affected by the communication." The Phillipses obviously had an interest, Chad suggests, in whether Kirk had the right to sell them a mausoleum and whether any other Burbage family members objected to interring the Phillipses at the family cemetery. Chad contends that the court of appeals erred when it found the letter unprotected by the "common-interest privilege"; specifically, Chad objects to the court of appeals' suggestion that "antithetical" interests cannot form the basis for a qualified privilege. 2011 WL 6756979, at *9. While the court of appeals seized on the "common-interest" language, which Chad sometimes used in briefing, our case law identifies the affirmative defense at issue here as qualified privilege.[2]

The trial court submitted the ten statements—four unprivileged and six potentially privileged—for the jury to determine if each statement was substantially true at the time it was made. On damages, the trial court submitted broad-form questions that incorporated the jury's answers for

---

[2] *Compare Cain*, 878 S.W.2d at 582 (privileging communication when made "in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication"), *with* RESTATEMENT (SECOND) OF TORTS § 596 (1977) (describing the common-interest privilege, which arises when "circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know").

6

all ten statements. If the qualified privilege applied to any statements, then, the broad-form damages questions incorporated both valid and invalid bases for liability. Such commingling may result in harmful error. *Cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (reversing for new trial due to erroneous commingling of valid and invalid liability theories in a single broad-form liability question). To obtain reversal due to such a charge error, Chad must have preserved the error at trial. *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("[A]ny complaint to a jury charge is waived unless specifically included in an objection."). We now turn to this preservation question.

## B. Preservation of Charge Error

The court of appeals held that Chad waived any claim of error in the submission of potentially privileged statements because he "did not object in the trial court to the submission of broad-form damages questions." ___ S.W. 3d at ___ (citing *In re B.L.D.*, 113 S.W.3d at 349). In *In re B.L.D.*, we held that the court of appeals erred by reviewing a jury charge complaint when the parties did not object at trial to the form of submission. 113 S.W.3d at 349, 355. Chad suggests that this case differs because he raised an objection on qualified privilege, which preserved error in any derivative damages question. Kirk responds that Chad must specifically object to the damages question's form, not merely to the underlying liability issue. Kirk further argues that even Chad's qualified privilege objection failed to preserve error.

### 1. Charge Error Based on Valid and Invalid Liability Theories

"It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law." *Casteel*, 22 S.W.3d at 388. Thus, in *Casteel*, we required a new trial when a timely and specific objection preserved the issue of erroneous commingling of valid and

7

invalid theories of liability in a broad-form liability question, such that the appellate court could not determine whether the jury based its verdict on an improperly submitted theory. *Id.* (citing TEX. R. APP. P. 61.1). Extending this principle in *Harris County v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002), we determined that a broad-form damages submission mixing valid and invalid elements of damages created the same type of harmful error. And in *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005), where evidence supported the jury's negligence finding but *not* its malicious credentialing finding, we held that the trial court committed harmful error by submitting an apportionment question which allowed the jury to consider malicious credentialing. We explained that "[e]ven if the jury *could* still have made the same apportionment of fault [without considering malicious credentialing], the error in the question is nevertheless reversible because it effectively prevents [the appellant] from complaining on appeal that they *would not* have done so." *Id.* at 226.

We continue to adhere to these principles. Yet in addition to the common animating principle of properly instructing the jury in the law, these cases share another link: *some* timely and specific objection. *Romero*, 166 S.W.3d at 229; *Harris Cnty.*, 96 S.W.3d at 232; *Casteel*, 22 S.W.3d at 387. In other words, in situations where a party does not raise a *Casteel*-type objection, that party surely cannot raise a *Casteel* issue when it failed to preserve a claim of an invalid theory of liability that forms the basis of a *Casteel*-type error. If we allowed litigants to raise a *Casteel* issue with no valid objection, either to liability or submission form, those litigants could use a post-trial motion to raise a lack of evidence on the liability question, thus bypassing the crucial step of allowing the trial judge to correct any errors in the charge.

8

In *Romero*, we declined to address whether the appellant must object both to the lack of evidence to support submission of a jury question *and* the form of the submission, because in that case the appellant did both. 166 S.W.3d at 229 & n.55 (acknowledging the difficult question of whether an additional broad-form objection is required) (citing *Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1124 (5th Cir. 1988)). But whether or not an objection to *both* is required, *some* timely and specific objection must raise the issue in the trial court. *See Thota v. Young*, 366 S.W.3d 678, 691 (Tex. 2012) (requiring "some objection to the charge," whether to evidentiary support or to form, to preserve error for appellate review). Here, Chad objected based on qualified privilege, but he made no objection to the form of submission. If Chad's initial objection on qualified privilege did not preserve error, we need not address whether a further *Casteel*-type objection is required.

## 2. Specific Objections

Our rules of procedure establish the preservation requirements to raise a jury-charge complaint on appeal. *Id.* at 689. The complaining party must object before the trial court and "must point out distinctly the objectionable matter and the grounds of the objection." TEX. R. CIV. P. 274; *see also* TEX. R. APP. P. 33.1. Under Rule of Civil Procedure 274, "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. As a general rule, preservation requires (1) a timely objection "stating the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and (2) a ruling. *See* TEX. R. APP. P. 33.1. Stated differently, the test ultimately asks "whether the party made the trial court aware of the complaint,

9

timely and plainly, and obtained a ruling." *State Dep't of Highways & Pub. Transp. v. Payne*, 838

S.W.2d 235, 241 (Tex. 1992).

Importantly, the "purpose of Rule 274 is to afford trial courts an opportunity to correct errors

in the charge by requiring objections both to clearly designate the error and to explain the grounds

for complaint." *Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987); *see Payne*, 838 S.W.2d at 243

(Mauzy, J., dissenting) ("Only by proper objection does a litigant afford the trial court sufficient

opportunity to correct defects in the charge."). We apply these rules to Chad's objection.

### 3. Chad's Objection

The following dialogue occurred at the formal charge conference:

Mr. Cagle:[3] I'm not sure if this is an objection. I apologize, Your Honor. But the matter of in the amended-- defendant's amended-- first amendment to the original response, defendant has requested that there be a qualified privilege relative to the letter, and the reason for the qualified privilege is it represents common interests, a continuation of a prior judicial proceeding in Maryland and a continuation of trying to resolve matters of mutual concern between the parties of the cemetery.

The Court: All right. Do you have a requested instruction that you're asking the Court to consider and to include in the charge?

Mr. A. Burbage: I have-- it seems as though it would-- it would require the-- a question in the line after-- after you find that the statement inflammatory, then there would be a question do you find the statement blah-blah-blah was false at the time it was made as it related to--

The Court: All right. Anything further on that? On that particular issue is there anything further?

---

[3] The record states that Mr. Cagle, Kirk's attorney, initially made the objection. The reproduction in Kirk's brief on the merits instead attributes the objection to Chad. Indeed, it makes more sense in context that Chad made the initial objection. We decline to attach importance to this potential record error because we find either objection insufficient to preserve error.

Mr. A. Burbage: No. It was-- it's been mentioned in the testimony.

The Court: All right. The objection is overruled. The requested instruction is denied.

Chad claims that the trial court erred in submitting liability questions on the potentially privileged statements. Therefore, Chad's objection needed to communicate to the trial court that it was improper to submit Questions 5 through 10 (on statements in the Phillips letters) to the jury. The objection does raise the subject of the qualified privilege. But, crucially, the objection must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem. *See Wilgus*, 730 S.W.2d at 672. When the trial court asked Chad whether he had a requested instruction, Chad responded only with a request for a question that appears to address the falsity of the statements themselves. As Chad has argued, a qualified privilege may still apply even when the statements are false. *See O'Neil*, 456 S.W.2d at 898. It is unclear what Chad hoped to accomplish by requesting an additional question if he wanted the court to withhold Question 5 through 10 from the jury.[4] And it is uncertain even to which questions Chad referred (presumably Questions 5 through 10, but the word "inflammatory," which Chad uses to describe the placement of his proposed question, appears nowhere in the charge). Quite simply, Chad has not provided a

---

[4] We cannot safely engage in assumptions about what Chad might have meant. Whether the statements were false and Chad knew of their falsity—compared with the jury's actual finding that the statements were not substantially true—would have relevance to the question of whether Chad acted with actual malice. But the trial court gave the incorrect common law definition of malice, Chad did not object to the incorrect malice definition, and, as Chad argues, the burden on actual malice falls to Kirk, not Chad. Such a confusing objection, raised during the crucial charge conference, could not have apprised the trial judge that Chad objected to the submission of the offending questions. Chad explained his desire more coherently at a hearing on his request for findings of fact and conclusions of law, but at that point it was too late.

specific objection indicating the alleged error in the charge and allowing the trial court the opportunity to correct the error.

We note that when Chad wanted to object to a specific question at the charge conference, he did so. *Before* the objection on qualified privilege at issue here, Chad objected to Question 10 because it duplicated elements of Questions 7 and 8. The trial court initially sustained this objection (although it reversed that ruling at the end of the charge conference). Chad's objection to qualified privilege, in order to preserve error, needed to distinctly raise the issue of withdrawing Questions 5 through 10 from the jury. By its language, it does not do this. And it would make little sense for Chad to raise an objection to qualified privilege to eliminate Questions 5 through 10 when, only moments before, he eliminated Question 10 only because it was duplicative of Questions 7 and 8, *not* because the Questions 7 and 8 were improper to submit to the jury. With this in mind, we cannot conclude that Chad's intent to remove Questions 5 through 10 was "apparent from the context." TEX. R. APP. P. 31.1(a)(1)(A). We hold that Chad's objection was insufficiently specific and did not preserve his claim of error in the submission of Questions 5 through 10.

Our procedural rules are technical, but not trivial. We construe such rules liberally so that the right to appeal is not lost unnecessarily. *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008). But when an objection fails to explain the nature of the error, we cannot make assumptions. Preservation of error reflects important prudential considerations recognizing that the judicial process benefits greatly when trial courts have the opportunity to first consider and rule on error. *In re B.L.D.*, 113

S.W.3d at 350 (citing *In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999)). Affording courts this opportunity conserves judicial resources and promotes fairness by ensuring that a party does not neglect a complaint at trial and raise it for the first time on appeal. *Id.* (citing *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex. 1982) (per curiam)). Nor may we stray from these rules because Chad represented himself at trial. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978).

### 4. Application

Chad argues that the court impermissibly combined valid and invalid theories of liability when the broad-form damages question incorporated privileged statements. Chad did not make a *Casteel*-type objection to form; thus, to preserve error, Chad *must* have raised some specific objection to the submission of Questions 5 through 10. *See In re B.L.D.*, 113 S.W.3d at 349–50 (holding that a complaint to a jury charge was waived because it was not specifically included in an objection). He did not. Thus, we hold that Chad's failure to object waives his right to complain of the charge on appeal.

### III. Damages

We next consider the jury's compensatory and exemplary damage awards. The jury awarded Kirk and the Burbage Funeral Home $3,802,000 in compensatory damages and $5,800,000 in exemplary damages, but the court of appeals reduced exemplary damages to

13

$750,000.[5] After reviewing the record, we hold that no evidence supports the amount of compensatory damages and, consequently, exemplary damages cannot stand.

## A. Compensatory Damages

Chad argues that the jury's $3.8 million award lacks evidentiary support and offends the First Amendment. Specifically, Chad contends that the $3.5 million awarded for *future* damages punishes Chad for his speech, rather than fairly compensates Kirk for his injury. Kirk responds that Texas law presumes damages for defamatory per se statements and ample evidence supports the jury's awards. Kirk suggests that trust-based businesses like funeral homes suffer greatly from the mere insinuation of unseemly acts. Further, Kirk argues that non-media defendants like Chad fail to present the same First Amendment concerns as media defendants.

Our legal-sufficiency review standards are well established. On an issue where the opposing party bears the burden of proof, we sustain a legal-sufficiency challenge to an adverse finding if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Ltd.*, 434 S.W.3d 142, 156 (Tex. 2014). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). We regard evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no

---

[5] Chad does not specifically challenge the $2,000 awarded as mental anguish damages. Therefore, we do not address those damages.

14

evidence. *Id.* We consider the evidence in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).

Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish. *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) (plurality opinion). But this presumption yields only nominal damages. *See Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012) (per curiam). Beyond nominal damages, we review presumed damages for evidentiary support. *See Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013).

In addition to the legal sufficiency of evidence, we have recognized an imperative that appellate courts determine whether any evidence supports the *amount* of jury damages. *See Bentley*, 94 S.W.3d at 606. In *Bentley*, a judge sued for defamation after a call-in talk show host repeatedly made on-air imputations of corruption. *Id.* at 566–67. The jury assessed $7 million in damages for mental anguish and $150,000 in reputation and character damages. *Id.* at 605. We recognized that the inherent difficulty in quantifying such noneconomic damages necessarily allows the jury latitude. *Id.* Yet this latitude has limits; latitude does not "give [the jury] carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials." *Id.* Even in a case outside the realm of media defendants and public officials, judicial review of jury discretion remains important to protect free speech. *See id.* We must ensure that noneconomic damages compensate for

15

*actual* injuries and are not simply "a disguised disapproval of the defendant." *Id.*; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("[T]he private defamation plaintiff who establishes liability under a less demanding standard than [knowledge of falsity or reckless disregard for the truth] may recover only such damages as are sufficient to compensate him for actual injury.").

Before turning to the evidence, we must delimit our review. The jury charge sets the standard. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). Questions 11 and 12 asked what sum of money "would fairly and reasonably compensate" for injuries sustained. The trial court instructed the jury that "[y]ou must make a finding of at least nominal damages for injury to reputation in the past." In response, the jury awarded $300,000 to Kirk and the Burbage Funeral Home. But on *future* reputation damages, the court instructed the jury to determine the appropriate compensation for injury "that, in reasonable probability, [Kirk] will sustain in the future" (and did not require the jury to find at least nominal damages). The jury awarded a combined $3.5 million in response. We must conduct a meaningful appellate review of the jury's determination of an amount that "would fairly and reasonably compensate" for the loss.

With these principles in mind, we turn to the evidence. Chad and Kirk vigorously disagree about the defamation's effect on the Burbage Funeral Home's business. The court of appeals upheld the large compensatory damage award in part because the funeral home

16

"had a market value of at least $3 million and . . . this value would likely be lost because of Chad's statements." ___ S.W.3d at ___. The court stated that Kirk was not required to substantiate the value with documentary evidence. *Id.*

Although we agree that the jury generally has broad latitude in determining damages, we find no evidence of actual injury in the record. To begin, we cannot credit the purported value of the funeral home business (leaving aside that this does not reflect actual damage to reputation). Kirk reluctantly offered a questionable estimate of the funeral home's value:

> Q. If you sold the funeral home today, what would the value of that funeral home be-- of the business, as an ongoing business?
>
> A. I never had any intention nor do I have any interest in selling the funeral home, so I never really-- if I had to throw something out there and just-- this is just from experience with hearing about other firms, but I don't-- I don't really know. I'd say a few million dollars.

This estimate is practically and linguistically troubling. Practically speaking, Kirk admits in the previous sentence that he does not know the value, and the phrase "if I had to throw something out there" qualifies his response. We require *some* concrete basis for an estimate. *Cf. Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159–61 (Tex. 2012) (concluding that speculative and conclusory testimony, lacking in demonstrable factual explanation, could not support an award of damages based on diminished market value of a home in a permanent nuisance claim). And Kirk's language adds ambiguity. How many is a few? The court of appeals interprets this as at least $3 million, but this is not clear: definitions of "few" vary. *See, e.g.*, AMERICAN HERITAGE COLLEGE DICTIONARY 505 (3d. ed. 2000) ("[b]eing more than one but indefinitely small in number"); RANDOM HOUSE

17

DICTIONARY OF THE ENGLISH LANGUAGE 712 (2d. ed. 1987) ("not many but more than one"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 843 (1961) ("not many persons or things").

We recently addressed an analogous situation in *Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Ltd.*, 434 S.W.3d 142 (Tex. 2014). In that case, the key evidence of injury to Texas Disposal Systems' reputation was its CEO's testimony estimating the value of its reputation at $10 million, and three exhibits purportedly supported that testimony. *Id.* at 160. The exhibits estimated lost profits and evidenced a decrease in "base business." *Id.* First, we held that damages such as lost profits "are not the sort of general damages that necessarily flow from such a defamatory publication." *Id.* Then, we stated that the "evidence must support the amount awarded by the jury; it must not be an 'indicator' that supports the estimates offered by the corporate executive." *Id.* Turning to this case, Kirk provided even less evidence than the "indicators" we found insufficient in *Waste Management.* Kirk's ballpark estimate of the Burbage Funeral Home's value does not equate to evidence of actual damages for injury to the business's reputation.[6]

---

[6] Furthermore, the purported evidence on the value of the business blurs the lines between the torts of business disparagement and business defamation. In *Waste Management*, we noted "the similarity between the two claims, but that one difference is that one claim seeks to protect reputation interests and the other seeks to protect economic interests against pecuniary loss." 434 S.W.3d at 155 (citing *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)). The publication at issue in that case was defamatory of the *owner* of the business, and not the landfill-services business *itself. Id.* at 150–51 n.35. In other words, defamation injures the reputation of the owner, not the owner's business. *Id.* In a defamation per se claim, general damages are presumed, while special damages are not; special damages, on the other hand, are an essential element of a business disparagement claim. *Id.* at 155. We distinguish between "general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special damages (which are economic damages such as for lost income)." *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013).

Turning back to this case, Kirk seems to seek damages to the business, rather than damages for loss of the

18

The record contains only speculative evidence that the value, if established, "would likely be lost," as the court of appeals found. *See* ___ S.W.3d at ___. Questioned whether the defamation could destroy the funeral home's reputation, Kirk said: "[P]otentially. In my opinion." Kirk said the value would be "zero" only when questioned on what would happen if the funeral home was "run out of business." Keith, Kirk's brother, testified that, in a small community, such allegations "can ruin that entire business." A theoretical possibility, however, is a far cry from a likely event.

Similarly speculative evidence supports the actual impact on the funeral home. Kirk testified that some customers, including customers with previous business at the funeral home, cancelled pre-paid contracts:

Q. Since these allegations have been made, have you had people who have cancelled those?

A. Yes, I have.

Q. Even as recently as last week?

A. Yes, sir.

Q. Have you ever asked them why they're cancelling it?

A. Couldn't bring myself to.

---

business's reputation. This fine distinction matters. If Kirk desired damages to protect the economic interests of the Burbage Funeral Home, a business disparagement claim provides the correct vehicle. *See Forbes*, 124 S.W.3d at 170. And, whether under defamation or business disparagement, we require a plaintiff requesting special damages to prove those damages. *See Hancock*, 400 S.W.3d at 66. Here, the type of damages Kirk seeks, economic damages, are distinct from the noneconomic damages that are presumed in a defamation per se case. Kirk did not plead these special damages and certainly has not proven them. Kirk could have brought business disparagement or defamation claims (or both), but in any case his proof will not suffice for recovery of special damages.

19

Q.     Are you afraid its because of these accusations?

A.     Yes.

In *Hancock v. Variyam*, a doctor claimed that the submission of a defamatory letter to an accrediting body, which later denied the doctor accreditation, provided evidence of reputation damages.  400 S.W.3d at 70.  This Court held that "a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Id.* at 70–71 (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)).  Similarly, the jury cannot reasonably infer that defamation caused the cancellations when the cancellations could have occurred for any number of reasons.  Indeed, Kirk admitted that he did not ask why the customers cancelled, only that he was "afraid" it was because of accusations.

Some evidence does suggest community awareness of and discussion of Chad's statements.  And Chad, in earlier menacing letters, suggested that the statements would have "significant repercussions."  But in terms of *actual* impact of the defamation—the basis for which the damage award compensates—Kirk offered only vague testimony:

Q.     How would you say that these accusations have affected your reputation in the community?  Do you still have one?

A.     I'd like to think that I do.  I'd like to think that there's those people that know me and-- that truly know me and that they're going to give it credence.  Sure, they're going to listen up, because they'd be stupid not to, but I'd like to believe that-- you know, that it-- that it doesn't affect everybody.  I'd like to believe that.

Q.     But you don't know.

20

A.      No, I don't know.

Kirk's mother, Virginia, when asked about the impact on the Burbage family name, said "I'm sure it could hurt some, but I think most people would not believe it."  Further, Kirk's testimony undermines the scope of the impact on him, personally:

Q.      You don't advertise with your photo anywhere or your name anywhere?

A.      No, sir.

Q.      Have there been any newspaper articles about you in conjunction with the funeral home or community service?

A.      Not that I can recall anyway.

Q.      Are you the only funeral director there at the Burbage Funeral Home?

A.      No. There are three others.

Q.      Are you-- are you-- Anna Burbage was the face of the Burbage Funeral Home; is that right?

A.      In her lifetime.

Q.      Are you considered the face of the Burbage Funeral Home?

A.      I don't know if I would be considered the face because I don't meet with a lot of the families any more unless it's a family that I know.  That's what I have the other directors to do.  I'm a lot more behind the scenes.

The court of appeals distinguished *Bentley* as a public-official case.  ___ S.W.3d at ___. While the concern for baseless jury awards has stronger resonance in public-official cases, such concerns are not absent here.  The evidence does not show actual loss of reputation, that anyone believed the defamation, that the Burbage Funeral Home suffered an actual loss, or even the funeral

21

home's actual value. On the record here, we hold that no evidence supports the jury's award of $3.8 million in actual damages. We reverse the judgment of the court of appeals in part.

## B. Exemplary Damages

A party may not recover exemplary damages unless the plaintiff establishes actual damages. *Hancock*, 400 S.W.3d at 71. Because we hold that no evidence supports the jury's award of actual damages, exemplary damages are not available. *See id.*

## IV. Prohibitive Injunction

As part of its final judgment, the trial court permanently enjoined Chad from "publishing, disseminating or causing to be published or disseminated, . . . to third-parties by any means, . . . any statement or representation that states, implies or suggests in whole or part" any of four pages of forbidden topics. The injunction tracks the language of the ten defamatory statements, and for many statements the injunction lists numerous ways Chad may run afoul of the court's order. For instance, Chad may not assert that he or *any* third party suffered from *any* of Kirk's selfish, greedy, or unlawful actions. This extraordinarily broad prohibition on future speech need not detain us long. Prohibitive injunctions of future speech that is the same or similar to speech that has been adjudicated to be defamatory operate as impermissible prior restraints on free speech.[7] *Kinney v. Barnes*, ___ S.W.3d ___, ___ (Tex. 2014). Under *Kinney*, the trial court's prohibitive injunction cannot stand. Therefore, we affirm that part of the court of appeals' judgment.

---

[7] A mandatory injunction requiring the removal or deletion of posted speech that has been adjudicated defamatory is not a prior restraint on speech. *Kinney v. Barnes*, ___ S.W.3d ___, ___ (Tex. 2014). But here the injunction did not require Chad to remove or delete any previously-made defamatory statements. Although Chad published several defamatory statements to his website and on posters, the website was only operative for approximately four months and the posters had been removed by trial.

22

## V. Conclusion

Chad failed to preserve for appeal his complaint of the jury charge; thus, we do not reach whether a qualified privilege protected any of Chad's statements. We therefore affirm in part the court of appeals' judgment. We do, however, hold that no evidence supports the jury's award of compensatory damages, and that exemplary damages cannot stand. We reverse that part of the court of appeals' judgment and render judgment that Kirk and the Burbage Funeral Home take nothing as compensatory and exemplary damages on their defamation claims. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009) (recognizing that "where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages" and instead rendering a take-nothing judgment). However, we do not reach mental anguish damages because Chad made no challenge in this Court. Finally, we hold that the prohibitive injunction impermissibly restrains speech; therefore, we affirm that part of the court of appeals' judgment.

_____
Paul W. Green
Justice

OPINION DELIVERED: August 29, 2014

23