

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

Nos. 07-18-00030-CV

L & S MEATS, LLC & MPK, LLC, APPELLANTS

V.

USA FEEDYARD, LP, APPELLEE

On Appeal from the 84th District Court
Hansford County, Texas
Trial Court Nos. CV05402, Honorable Curt W. Brancheau, Presiding

January 22, 2020

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

This appeal arises from a cattle speculation plan gone awry. The speculation involved the purchase of one or more lots of cattle at about 325 pounds per head, leaving them in a feedlot to be fed, and selling the lots in about a year and after each head gained in weight to about 1,325 pounds. It was hoped that the state of the cattle market and the price at which cattle was being bought would result in a sales price sufficient to cover the cost of feeding and caring for the cattle and leave the speculators with a profit. L & S Meats, LLC and MPK, LLC (collectively referred to as Meat) were the speculators. The

feedlot with which it arranged to feed the cattle was USA Feedyard, LP (USA). And, the entities began a business relationship that would last about two years. As part of that relationship, USA agreed to assist Meat in finding particular lots of cattle to buy. That assistance included USA developing break-even projections for Meat regarding the lots under consideration. An incremental component of those projections was the estimated cost of feeding the cattle between time of purchase and sale. Apparently, USA estimated that cost by inputting a wrong factor into the equation. That the factor was wrong was uncontested; the representative of USA acknowledged as much. Yet, the mistake was not discovered until after Meat encountered a downturn in the cattle market and began losing money on its cattle purchases. That resulted in Meat 1) refusing to recompense USA for its services related to feeding and caring for the cattle it bought and committed to buy and 2) suing USA for negligence, negligent misrepresentation, and fraud. USA counterclaimed for breach of contract. Trial was to a jury, which found that USA did utter negligent misrepresentations upon which Meat justifiably relied. Yet, it awarded Meat no damages. In turn, it found that Meat breached its "obligations" to USA and awarded USA damages against Meat. The trial court entered judgment upon the verdict, and Meat appealed. We modify the judgment and affirm the judgment as modified.

The issues asserted by Meat are rather numerous. It attacks both the recovery denied it and that granted USA. We begin our analysis by addressing the former.

*Negligent Misrepresentation*

The first issue concerns Jury Question 6. Through it, the trial court asked the jury to measure the damages recoverable by Meat due to the misrepresentations upon which

2

Meat relied.[1]  Meat contends that the question posed should have been submitted in broad form and improperly narrowed the damages recoverable.  We overrule the issue.

*Economic Loss Rule*

Among other things, USA argued that any defect in Question 6 was harmless because the damages Meat sought were precluded under the economic loss rule.  That rule generally bars recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy.  *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam).  As noted in *Chapman*, a party states a viable tort claim under the rule when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit.  *Id.*

Meat's underlying complaint concerns the provision of defective break-even projections by USA.  Meat would use those projections to determine whether to buy particular lots of cattle for feeding and care by USA.  The latter had no contract with Meat to provide the projections.  Thus, it cannot be said that any duty to provide the projections and use care in compiling them arose from contract.  In other words, the duty at issue here, i.e., to use care in compiling the projections, did not arise from contract.  So, the first prong of *Chapman* does not preclude Meat's claim.

The same cannot be said of the second *Chapman* prong.  Again, it requires that the harm suffered cannot be merely the economic loss of a contractual benefit.  *Chapman*

---

[1] Through Question 5, the court asked the jury if USA made "a negligent misrepresentation regarding any of the lots of cattle identified below on which [Meat] justifiably relied." The jury answered affirmatively with regard to 52 lots.

described that type of harm contemplated as "economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Id.* While there may not have been a contract between Meat and USA regarding the development of break-even projections, those projections were nonetheless used as a basis for entering into a contract with USA. That contract consisted, among other things, of feeding the acquired cattle until their weight achieved a particular point.[2] Meat expected the cost would be *x* dollars per head, given the projections. Yet, achieving that requisite weight point cost more than USA represented, and Meat sought to recover the excess.[3] Recovering the excess would give Meat the expectancy it thought it was going to get under the contract, i.e., expending only *x* dollars to fatten the cattle to the requisite weight for the requisite period. So, it was seeking the economic loss of a contractual expectancy, which, in turn, means that the second prong of *Chapman* was and is not satisfied.

The situation before us is akin to Meat being induced to enter into a contract with USA via misrepresentations and ultimately suing to recover the contractual benefit it would have had if the representations were accurate. The contractual benefit or expectancy when entering the contract consisted of feeding the cattle to the target weight for the amount reflected in the projections. But, the cost projection was wrong and the expected benefit based on the projection was lost. Had the misrepresentation been

---

[2] For a more thorough discussion of the nature of the implied contract serving as the basis for the expectancy, refer to later portions of this opinion addressing issues raised concerning other jury questions, more specifically Questions 7, 8, and 9. *See infra* pp. 8–9, 12–13.

[3] In essence, Meat attempted to supplement the profit, if any, it lost in having to incur additional expense. The additional expense arose due to its reliance on USA's misrepresentations. The additional expense and its impact on the ultimate price received once the cattle were sold resulted in a reduction of profit, and that is little more than an economic loss. *See Bass v. City of Dallas*, 34 S.W.3d 1, 9 (Tex. App.— Amarillo 2000, no pet.) (describing "economic loss" as, among other things, the "consequent loss of profits").

intentional, then the economic loss rule would not have barred recovery. Meat could have pursued recovery of the lost contractual benefit. But because it was negligently made, the intended benefit of its bargain with USA cannot be recovered. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998) (per curiam) (stating that "[u]nlike fraudulent inducement, the benefit of the bargain measure of damages is not available for a claim of negligent misrepresentation"); *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 798 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (noting *D.S.A.* and reiterating that the benefit of the bargain measure of damages is unavailable for a claim of negligent misrepresentation). Instead, Meat is limited to collecting damages for injury apart from the benefit of the bargain it expected when contracting with USA to feed its cattle, and no such damages were sought by it. So, even if we were to assume *arguendo* that Jury Question 6 was defective, the defect resulted in no harm to Meat; and we ultimately overrule its issue.

*Questions 7, 8, 9, 10, 11, and 12*

Next, we address Meat's complaints regarding Jury Questions 7 and 8 and the answers thereto. Via Question 7, the jury was asked the following: "Did [Meat] fail to comply with their obligations to [USA] arising out of the cattle transactions described below?" Under the question appeared a diagram comprised of two columns of boxes. At the top of the left column was the word "lot" with various numbers written in each box thereunder. The directive to answer "yes" or "no" appeared atop the column on the right. Prefacing the diagram was the following phrase: "Cattle specifically described in signed promissory notes." Each box corresponding to a particular "lot" number was answered "yes" by the jury.

5

Through Question 8, the jury was asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [USA] for its damages, if any, that resulted from such failure to comply." Following that passage was the following directive: "Consider the following elements of damages, if any, and none other. The difference, if any, between the sales proceeds received by [USA] when the cattle were sold and USA's purchase, feeding and care costs, and USA's cost to finance these items." The sum of $426,717.41 was entered in a blank referring to L&S Meats, while $229,578.60 was written in the blank referring to MPK.

The initial contention we address is that wherein Meat argued that "Question 7, along with its accompanying instruction, fails to submit a proper theory of recovery, and cannot support a judgment for recovery under a promissory note." It believes this is so because 1) "Question 7 has *nothing* to do with whether [Meat] failed to comply with their obligations under the *notes*"; 2) it "does not even mention the notes or their terms"; and 3) it "inquires of whether [Meat] failed to comply with their unspecified *obligations* arising from *cattle transactions*." We overrule the issue.

In addressing the contention, some well-settled principles come to mind. They regard the viewpoint from which we view jury questions. The relevant viewpoint is that of a juror untrained in the law, *see Galveston, Harrisburg & San Antonio Ry. Co. v. Washington*, 94 Tex. 510, 517 (1901); *N. Tex. Traction Co. v. Thetford*, 28 S.W.2d 906, 913 (Tex. Civ. App.—Fort Worth 1930) (op. on reh'g), *rev'd in part on other grounds*, 44 S.W.2d 902 (Tex. Comm'n App. 1932, holding approved), who is exercising common sense. *See Broughton v. Humble Oil & Ref. Co.*, 105 S.W.2d 480, 485 (Tex. Civ. App.—El Paso 1937, writ ref'd). Additionally, the questions and instructions are afforded a reasonable, as opposed to technical, construction. *See DoAll Dallas Co. v. Trinity Nat'l*

6

*Bank of Dallas*, 498 S.W.2d 396, 400 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.) (sub. op.); *Tex. Emp'rs Ins. Ass'n v. McDowell,* 278 S.W.2d 444, 446 (Tex. Civ. App.—Amarillo 1955, writ ref'd n.r.e.); *accord Broughton,* 105 S.W.2d at 485 (observing that a natural, unstrained construction should prevail).  To that we add the duty to interpret them as of the time they were prepared, *see Atchison, Topeka & Santa Fe Ry. Co. v. Acosta*, 435 S.W.2d 539, 545 (Tex. Civ. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.), and in the context of the whole situation before the jury.  *See Broughton*, 105 S.W.2d at 485–86.  Included in the situation before the jury are such things as the nature of the dispute and claims between the parties and the evidence relevant to them.  *Id.* at 485.  That said, we turn to the contention at bar and immediately recognize the somewhat narrow focus upon which it is based.

As previously mentioned, USA's concerns with Meat arose from a continuing mode of transacting business between each other.  That mode involved representatives of Meat asking USA to buy cattle on its behalf, arrange for its delivery if necessary, and provide for its care and feeding until sold.  Promissory notes naming USA as payee were executed by Meat in conjunction with the various lots of cattle being purchased.  Apparently, though, their execution did not necessarily occur prior to USA's acquisition of the bovine.  Moreover, the relationship between Meat and USA began to deteriorate in late 2015 and early 2016.  Coincidentally, the deterioration occurred in conjunction with the drop in cattle prices.

Meat began losing large sums of money.  As a result, it decided to end the business relationship with USA.  It also refused to 1) execute additional promissory notes reflecting cattle purchases that had been made at its request but which cattle had yet to be delivered to the feedlot and 2) pay for corn it asked USA to acquire in the future, which corn would

7

be fed to its cattle. This resulted in USA suing to recover not only the cost of the cattle it acquired but also for expenses related to its acquisition, feeding, and care, as alleged in the third amended counterclaim of USA. Interestingly, though, it mentioned nothing in its counterclaim of suing upon the promissory notes themselves and recovering a respective deficiency allegedly due under each. Nor did it refer to any deficiency related to the nonpayment of any particular note when presenting evidence of the damages recoverable. Instead, USA asked its witness, "And what was – what is the total amount that USA [was] owed through the day before trial, this past Sunday, on cattle on which [Meat] . . . signed notes to the feed yard, and on those lots, how much did they owe?" The response was "$670,974.29."

So, what the jury had before it was a scenario wherein Meat entered into what one could compare to as an oral umbrella agreement. Under the accord, Meat would direct USA to purchase certain lots of cattle. USA would finance the purchase, save for a small amount which Meat would pay as "equity" for each lot.[4] Per the umbrella agreement, Meat would then execute a promissory note referencing the particular lot being purchased and financed. The overall oral agreement also obligated USA to care for and feed the cattle until sold. When the cattle were sold, USA would then recoup its expenses (e.g., the purchase price and cost of caring for and feeding the bovine) and forward Meat the excess or profit, if any. Eventually, Meat opted to forgo paying the expenses incurred by USA. Some of the lots consisted of cattle for which Meat had executed a promissory note per the oral umbrella agreement. The other lots were not referenced within an eventual promissory note, the reason being the deterioration of the business relationship and the

---

[4] The sum was $125 per head.

8

refusal of Meat to execute such notes once the cattle within those lots were received by USA. But, whether reflected within a corresponding promissory note or not, each lot was acquired under the oral umbrella agreement, and under that same umbrella agreement, Meat obligated itself to pay USA for the cattle and its care.

Given the foregoing factual scenario, the trial court submitted to the jury Questions 7 and 9. Again, through the former, it asked: "Did [Meat] fail to comply with their obligations to [USA] arising out of the cattle transactions described below?" The "cattle transactions described below" were those "Cattle specifically described in signed promissory notes[.]" Through Question 9, the jury was asked a like question, that being whether "[Meat] fail[ed] to comply with their obligations to [USA] arising out of the cattle transactions described below." This time, though, the "cattle transactions described below" were the "Cattle not specifically described in signed promissory notes[.]"

To reiterate, we must afford a jury question a reasonable, as opposed to technical, interpretation from the viewpoint of a juror untrained in the law but exercising common sense. And, the reasonable, commonsensical jury having seen the nature of the business relationship between USA and Meat and the issues being tried would lead us to construe both Questions 7 and 9 as encompassing what we call the oral umbrella agreement and the "obligations" of Meat under it. Those "obligations" consisted of the general, nonspecific, overall promise to pay USA for the expenses of acquiring and rearing the cattle. Indeed, the jury instruction accompanying Question 8 indicates as much.

Question 8 directed the jury to calculate the damages recoverable when Meat failed to abide by its "obligations." Those damages were limited to the "difference, if any, between the sales proceeds received by [USA] when the cattle were sold and USA's purchase, feeding and care costs, and USA's cost to finance these items."

9

Moreover, Meat did not object to Question 9 before the trial court submitted it to the jury. Though the same is not true regarding Question 7, the objections uttered were limited. Meat simply asserted that the question 1) "should be submitted in broad form"; 2) "constitutes a comment on the weight of the evidence in connection with Defendant's theory that Plaintiffs could not rely on the projections provided to them by Defendant for the purchase of the individual lots of cattle"; and, 3) "it will nudge the jury in the direction of the Defendant's theory." As can be seen, nothing was said about the question being nonspecific, omitting elements, being immaterial, referring to an agreement other than one founded on the promissory notes, referring to a nonexistent agreement, or the like. So, its current objections about the questions' wording and their failure to specify the "obligations" at issue were waived. *See* TEX. R. CIV. P. 274 (stating that a party objecting to a charge must specify the objectionable matter and the grounds of the objection and that any complaint concerning any defect, omission, or fault in the pleading is waived unless specifically included in the objection); *Burbage v. Burbage*, 447 S.W.3d 249, 256 (Tex. 2014) (stating the same).

And, because each question apparently related to the obligations imposed via the general, nonspecific oral umbrella agreement as opposed to the individual promissory notes, it matters not that Question 7 said nothing about the elements underlying a cause of action to recover upon a note. *See TrueStar Petrol. Corp. v. Eagle Oil & Gas Co.,* 323 S.W.3d 316, 319 (Tex. App.—Dallas 2010, no pet.) (stating that, to prevail, a plaintiff must prove the note in question, that the defendant signed it, that the plaintiff is the legal owner and holder of the note, and that a certain balance is due and owing). So, the contention about the omission of those elements is inconsequential.

10

As for the contention that the answer to Question 7 was immaterial because it posed a question of law, we note the following. Meat said nothing of that when given the opportunity to object during the charge conference. Thus, it too was waived. *See Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627–28 (Tex. App.—Dallas 2004, pet. denied) (wherein the appellant argued that "the trial court erred in submitting the question to the jury because whether a contract has been breached is a question of law" and holding the Mitchells waived the complaint by failing to assert it before the charge was read to the jury); *accord Ibarra v. City of Laredo*, No. 04-10-00665-CV, 2012 Tex. App. LEXIS 5741, at *5–6 (Tex. App.—San Antonio July 18, 2012, no pet.) (mem. op.) (holding the same).

We further note that both the existence of a contract and its breach are questions of fact, unless undisputed. *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam); *Austin Tapas, L.P. v. Performance Food Grp., Inc.*, No. 03-18-00680-CV, 2019 Tex. App. LEXIS 6589, at *5 (Tex. App.—Austin Aug. 1, 2019, no pet.) (mem. op.); *Berg v. Wilson*, 353 S.W.3d 166, 174 (Tex. App.—Texarkana 2011, pet. denied). Meat did not concede the existence of the umbrella agreement and the "obligations" arising under it to pay for the lots of cattle and expenses related to caring for them. Nor did it concede that it breached those obligations. Thus, such topics were questions of fact for the jury to decide, not questions of law for the court.

Regarding Jury Question 9, Meat believed it also to be immaterial and defective for reasons similar to the purported immateriality and defectiveness of Question 7. Yet, those complaints too should be overruled for the very same reasons the complaints about Question 7 were.

Meat also complained here that Question 9 was immaterial because there was "no record evidence of any specific terms of any alleged oral contract." Admittedly, our

perusal of the record uncovered no express contract between it and USA delineating the specific terms of an agreement. Yet, contracts arise in various ways, one of which is through a course of conduct. *See Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.,* 625 S.W.2d 295, 298 (Tex. 1981) (stating that "[e]ven prior to the enactment of the [Uniform Commercial] Code it was recognized in Texas that a contract could be formed by conduct" and "[s]uch a contract is one implied in fact"). An implied contract arises when the parties' acts indicate, according to the ordinary course of dealing and common understanding, that there is a mutual intention to contract. *Id.*; *Stewart & Stevenson, LLC v. Galveston Party Boats, Inc.*, No. 01-09-00030-CV, 2009 Tex. App. LEXIS 8582, at *28 (Tex. App.—Houston [1st Dist.] Nov. 5, 2009, no pet.) (mem. op.). The record at bar contains evidence of 1) Meat repeatedly approaching USA to buy cattle for it; 2) USA buying and raising the cattle; 3) the cattle later being sold; and, 4) USA forwarding the proceeds of the sale to Meat after deducting the costs it incurred in buying and raising the cattle. If nothing else, that is some evidence of an ordinary course of dealing evincing a common understanding and mutual intention to contract. That is, it is some evidence of a contract between the parties arising by implication. It is also some evidence of an agreement by Meat to repay USA for buying, raising, feeding, and selling the lots of cattle it sought. And, not until the cattle market dropped many months after the parties began their business relationship did Meat deign to question the arrangement. So, Meat is mistaken in arguing that Question 9 was immaterial because there was no record evidence of a contract.

As for Meat's current complaints about Question 10, we start with the one about it being immaterial because there was no evidence of a contract between the parties. Question 10 tracked the language of Question 8; through it, the jury was asked to

determine the sum of money, if any, payable which "would fairly and reasonably compensate [USA] for its damages, if any, that resulted from" Meat's failure to comply with the "obligations" encompassed within Question 9. And, because there was evidence of a contract between Meat and USA, as we concluded in the immediately preceding paragraph, Question 10 is not immaterial for the reason Meat proffered.

As for the complaint that Question 10 was immaterial because it incorporated the wrong measure of damages, Meat did not complain about the measure used at trial.[5] Thus, it waived the complaint here. Moreover, this complaint, too, is premised on the notion of there being no evidence of a contract between Meat and USA; yet, as previously discussed, the record contains such evidence.

As for the complaint about Question 10 being immaterial because of the supposed "absence of any valid predicate finding that [Meat] breached the terms of [an] alleged contract with USA," it is unaccompanied by substantive analysis and, therefore, waived. *Anderson v. Safeway Tom Thumb*, No. 02-18-00113-CV, 2019 Tex. App. LEXIS 4284, at *7 (Tex. App.—Fort Worth May 23, 2019, pet. denied) (mem. op.) (stating that "[i]n the absence of appropriate record citations or a substantive analysis, a brief does not present an adequate appellate issue"). Furthermore, the question actually is predicated upon an

---

[5] Indeed, Meat sought to apply the measure of damages relating to a sale of goods under the Uniform Commercial Code. Yet, that Code applies to "transactions in goods." TEX. BUS. & COM. CODE ANN. § 2.102 (West 2009). No one referred us to anything in the record indicating that USA was merely selling goods to Meat. USA was obviously supplying services, too. And, most importantly, Meat does not argue here that the sale of goods was the dominant factor or the essence of the transaction in its business relationship with USA. *See Summit Glob. Contractors, Inc. v. Enbridge Energy, L.P.*, __S.W.3d__, __, 2019 Tex. App. LEXIS 10657, at *11 (Tex. App.—Houston [14th Dist.] Dec. 10, 2019, no pet.) (stating that "Texas's version of the Uniform Commercial Code applies to the sale of goods" and "[w]hen a contract contains a mix of sales and services, the UCC applies if the sale of goods is the 'dominant factor' or 'essence' of the transaction").

Incidentally, Meat also tried to invoke those provisions of the Texas Business and Commerce Code relating to transactions in goods to negate the validity of Jury Question 9. But, again, it did not urge the applicability of the UCC during the charge conference or attempt to illustrate that its business relationship with USA was dominated by the sale of goods. So, we overrule that contention as well.

affirmative answer to Question 9, and the latter encompassed whether Meat failed to perform its "obligations" to USA arising from the cattle transactions. The jury answering Question 9 affirmatively means that the predicate to Question 10 is present. So, we overrule this complaint, too.

As for the contention that no evidence supports the jury's answer to Question 10, we disagree. A witness for USA testified that $221,823 and change was owed to it; the jury happened to award that exact amount. Furthermore, the multiple components of that sum were explained in USA's Exhibit 500.

As for the contention that no evidence appears of record indicating that the damages awarded in Question 10 were reasonable and necessary, the complaint is premised on the conclusory argument that, "by its submission of Question 10, USA is seeking recovery in the nature of 'remedial damages.'" Why the damages sought were remedial and only remedial went unexplained. Again, Meat merely concluded as much. Thus, the issue was inadequately briefed, and we overrule it. *See id.*

Regarding the complaints about Question 11, we note the following.[6] They too concern allegations about "compositional problem[s]" akin to Questions 7 and 9 and about which Meat failed to object during the charge conference. Consequently, those "compositional problem[s]" were waived, too. As for the complaint that Question 11 said nothing about the terms of the agreement underlying the corn purchases encompassed by the question, the record contains evidence of Meat simply asking USA, via email, to buy the corn. Other evidence indicates that the corn was to be fed to Meat's cattle. The

---

[6] The question read as follows: "Did [Meat] fail to comply with their obligations to [USA] arising out of the corn transactions described below?" The jury answered "yes" regarding all the listed transactions.

14

rather loose nature of the transactions comports with the overall loose nature of the business relationship (i.e., the buying, feeding, and selling of cattle) in which Meat and USA engaged for some time.  Simply put, their continuing course of conduct supplied the evidence Meat now claims was missing.

As for the complaints about Question 12, we say the following.[7]  Meat mistakenly argues that the damages awarded therein were not predicated on a finding of breached contract.  The requisite predicate appeared through the answer to Question 11.  And, because Meat failed to object to the "compositional problem[s]" in Question 11, it cannot now argue that the answer was insufficient to be the predicate to Question 12.  So too do we find evidence of record indicating damages of $284,742, i.e., the amount awarded.  USA's bookkeeper testified to same.  Thus, the finding has evidentiary support.  Furthermore, USA's Exhibit 501 itemized the sums comprising the $284,742 sought by and awarded to it, and the itemization included amounts attributable to interest.

As for the allegation that there was no evidence of Meat agreeing to pay the 4.5% interest rate included in the award given under Question 12, statute entitled USA to charge a rate of 6%.  *See* TEX. FIN. CODE ANN. § 302.002 (West 2016) (stating that, "[i]f a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended beginning on the 30th day after the date on which the amount is due").  Having the authority to charge a rate of 6%, USA was free to charge less.  And, we cannot accept Meat's supposition that USA failed to prove the rate was

---

[7] The question read as follows: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate [USA] for its damages, if any, that resulted from such failure to comply?"  The jury answered "$284,742.27."

reasonable when the rate levied was less than that permitted by statute. Consequently, Meat's complaint about Question 12 and the jury's answer to it are overruled as well.

*Attorney's Fees*

Meat finally complains about the award of attorney's fees to USA. The jury initially denied such fees to USA. The trial court subsequently awarded them via judgment notwithstanding the verdict. Among other things, Meat now contends that the fees should be disallowed because neither statute nor contract provided for same. In response, USA conceded that its attorney's fees were not recoverable under section 38 of the Civil Practice and Remedies Code and "agree[d] that attorneys' fees must be based on the agreement in the promissory notes." We sustain the issue.

The clause in the promissory note concerning attorney's fees stated that the "undersigned agrees that if . . . this Note is [p]laced in the hands of any attorney for collection or to defend or enforce any of the holder's rights hereunder or any instrument securing payment of this Note, the undersigned will pay to such holder its reasonable attorney's fees" as well as "all court costs and other expenses incurred in connection therewith." This provision contemplates effort to collect upon, defend, or enforce the promissory note. Yet, USA did not sue upon the promissory note. Indeed, in addressing Meat's contentions about Question 7 lacking the elements of a suit on a promissory note, it argued that Meat's position was "based on the faulty premise that USA was seeking relief as a secured creditor trying to recover a balance on a promissory note after a foreclosure on collateral." Rather, "USA alleged in its pleadings and the undisputed evidence showed that the parties made a series of agreements by which [Meat] acquired cattle from third parties and from USA for feeding and care, [and] USA provided feed and care for their cattle, and USA financed that program." Furthermore, the "[p]romissory

16

notes were used as a means to keep track of the transactions until [Meat] breached its agreements and stopped signing notes, but the overall claim was one for breach of contract," and the trial court "properly submitted the case on a breach of contract basis." In other words, USA sued Meat for breaching what we earlier labelled the umbrella agreement, not for breaching the promissory notes. Thus, the attorney's fees provisions within the notes were inapplicable. Simply put, USA was not suing to collect, defend, or enforce the notes, and, consequently, an award of fees cannot be founded upon those notes.

In sum, we overrule all issues asserted by Meat save for that related to the award of attorney's fees. Consequently, we modify the final judgment to redact therefrom the award of attorney's fees granted USA and then affirm said judgment as modified.


Brian Quinn
Chief Justice

17