**AFFIRMED and Opinion Filed October 28, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-00093-CV

**CORNERSTONE STAFFING SOLUTIONS, INC., Appellant**
**V.**
**VALTECH SOLUTIONS, INC. AND**
**VALTECH SERVICES, INC., Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-10346**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Nowell, and Evans
Opinion by Justice Evans

After a jury trial, Cornerstone Staffing Solutions, Inc., appeals from the trial court's adverse judgment on Valtech Services, Inc.'s breach of contract claim against it.[1] Appellee Valtech Services, Inc. is a subsidiary of appellee Valtech Solutions, Inc. which, in turn, is a U.S. subsidiary of Valtech, S.E., a European

---

[1] The final judgment followed bifurcated trials on June 11, 2018 and August 27, 2018 in consolidated cases *Valtech Services, Inc. v. Cornerstone Staffing Solutions*, No. DC-16-10346 and *Cornerstone Staffing Solutions, Inc., v. Valtech Solutions, Inc.*, No. DC-17-02424.

company.[2]  In two issues, Cornerstone generally challenges the legal sufficiency of the evidence to support the jury's verdict.  Cornerstone also brings a conditional issue, in the event we reverse the trial court's judgment based on either of its first two issues.  For the reasons set forth below, we affirm the trial court's judgment.

## BACKGROUND

Valtech provides information technology services/digital marketing throughout the United States.[3]  Cornerstone provides staffing services nationwide. In December 2015, the parties signed an asset purchase agreement (APA) setting forth the details of Cornerstone's purchase of assets related to Valtech's information technology temporary staffing, recruiting, and related staffing business.[4] Cornerstone paid $1.9 million at the closing of the sale (Initial Payment), which occurred in December before Valtech had completed year-end accounting of its books to submit to its parent company's auditors.  The APA, however, provided that Cornerstone would make an additional payment after the closing should certain metrics set forth in the agreement be met (Initial Payment Adjustment or IPA) generally comprised of a multiple of earnings before interest, taxes, depreciation and

---

[2] Although Cornerstone identifies Valtech Solutions as an appellee, it appeals only the judgment rendered in favor of Valtech Services.  Cornerstone's conditional third issue, however, seeks remand of claims on which Valtech Solutions was awarded attorney's fees.  Unless otherwise indicated, "Valtech" refers to Valtech Services.

[3] In 2014, Valtech Solutions spun off its information technology (IT) recruiting and temporary staffing business to Valtech Services which began operating on January 1, 2015.

[4] The purchased assets included staffing service contracts, licenses, list of personnel, non-competition agreements, telephone numbers, registrations, certifications, and assumption of company office leases.

amortization (EBITDA).[5]  Specifically, the primary provision addressing the IPA stated:

> 2.3.2. If pursuant to the consolidated audited financial statements of Valtech S.E., as at December 31, 2015, the amount equal to four point two (4.2) times the EBITDA realized by the Business during said fiscal year is greater than the Initial Payment, as notified by the Seller to the Buyer no later than on April l5, 2016, then the Buyer shall pay, subject to the Buyer's consent (which shall not be unreasonably withheld) to the Seller the amount of such difference (the *"Initial Payment Adjustment"*). The Initial Payment Adjustment is non-refundable, as contemplated in Section 2.3.3 below (without limiting the indemnification obligations under Section 8.7 of this Agreement). Such Initial Payment Adjustment will be subject to the Buyer's complete and prompt access to the books, records, and calculations of the Seller and its agents serving as the basis for the Initial Payment Adjustment;

The term "EBITDA," in turn, is defined in section 1.17 of the APA as "the operating income and depreciation, as illustrated on the profit and loss statement of the Business in the form and format used on Exhibit B." [6]  According to section 1.8 of the APA, "Business" had the meaning set forth in the recitals of the parties' agreement:  "WHEREAS, the Seller is the owner of all of the assets described on Exhibit A and as further defined below (the *"Assets"*) relating to Seller's information technology temporary staffing, recruiting, and related staffing business (the *Business*")"  (emphasis in original).

---

[5] Cornerstone's CEO testified that the $1.9 million was a reduced purchase price and the parties agreed to an initial payment adjustment provision.

[6] At trial there was testimony that EBITDA is an acronym "earnings before interest, taxes, depreciation and amortization" representing "a measurement of the recurring, ongoing performance of the company." But the non-standard term does not have a defined method of calculation or meaning under generally accepted accounting principles or international; financial reporting standards in ordinary usage.

On February 22, 2016 Valtech notified Cornerstone of its EBITDA calculation and that an IPA was due. In response, Cornerstone requested an "accounts receivable rollforward schedule" which Valtech provided. Having heard nothing further from Cornerstone, on April 11, 2016, Valtech made an official written demand to Cornerstone for an IPA of $1,791,524. In support of its IPA calculation, Valtech attached its EBITDA calculation from its February 22 email and a calculation showing the amount of IPA due. It is undisputed that the financial statement that Valtech used for purposes of doing its IPA demand was not audited. However, Valtech's parent company's auditors accessed Valtech's year-end financial data through Valtech's accounting system and subjected the data to their audit criteria before compiling Valtech, S.E.'s consolidated audited financial statements. Cornerstone failed and refused to pay any IPA, asserting "all calculations of the purchase price are to be made based on the audited financial statements of Valtech, S.E." and Valtech's calculations were based on "[t]he latest version of the Valtech Services P&L." Cornerstone made other complaints about Valtech's calculations and indicated that it was "engaging an independent auditing firm to review the financials, books, and records of Valtech—as expressly permitted by the Agreement." Cornerstone, however, never requested the consolidated audited financials of Valtech, S.E. The parties were unable to resolve their dispute and

Valtech ultimately filed this breach of contract lawsuit.[7] The matter proceeded to trial and the jury was asked the following question to which neither party objected:

QUESTION 1(a)

Did Cornerstone Staffing fail to comply with Section 2.3.2 of the APA?

You are instructed that in order to answer "Yes" you must find that Valtech Services complied with the condition imposed upon it under the APA.

Answer "Yes" or "No."

Answer: YES

The jury went on to award Valtech damages for Cornerstone's failure to comply with Section 2.3.2. The jury also returned a verdict in favor of Cornerstone on its claim for money had and received. The trial court rendered judgment on the verdict awarding Valtech $717,437.12 in actual damages and $1,612,546 for attorney's fees in the trial court, among other relief.[8] Cornerstone filed this appeal from the trial court's final judgment.

---

[7] Valtech also sought a declaratory judgment involving an offset claim. Cornerstone filed an answer and counterclaim against Valtech. Additionally, Cornerstone filed a separate action seeking to enforce certain non-compete clauses in the APA. Although the two suits were consolidated, the claims involving the IPA payment were tried separately from other issues.

[8] The final judgment incorporated the jury's verdict, offsets per the parties' trial stipulation, and the trial court's directed verdict in favor of Valtech on its breach of contract claim for Cornerstone's failure to comply with the "Master Services Agreement." The judgment also awarded costs through trial and conditional appellate attorney's fees.

ANALYSIS

The resolution of this case turns on the meaning of section 2.3.2 of the APA.[9] The parties do not dispute that section 2.3.2 contains a condition precedent to Valtech's entitlement to an IPA. Instead, the parties argue about what that condition precedent required. The question submitted necessarily required the jury to find Valtech complied with the APA's condition before determining Cornerstone failed to comply with section 2.3.2. But the jury charge did not define the condition. At trial, both parties argued and provided evidence to support its version of what the condition required.

In its first issue on appeal, Cornerstone asserts the APA unambiguously set forth the following three requirements before Cornerstone was obligated to pay any IPA:

(1) Valtech must notify Cornerstone of its IPA calculation "no later than April 15, 2016";

(2) The IPA calculation must be "pursuant to the consolidated audited financial statements of Valtech, S.E., as at December 31, 2015"; and

(3) Valtech, S.E.'s audited financial statements show the amount equal to 4.2 times the EBITDA realized by the Business during the 2015 fiscal year was greater than the initial payment of $1.9 million.

---

[9] Both parties moved for summary judgment arguing their interpretation controlled as a matter of law. The trial court denied both motions. At trial, Cornerstone moved for an instructed verdict on its interpretation which the trial court also denied.

Central to the parties' dispute about the meaning of the contract is the phrase in section 2.3.2, "If pursuant to the consolidated audited financial statements of Valtech S.E., as at December 31, 2015, the amount equal to four point two (4.2) times the EBITDA realized by the Business . . . ," and the contractual definition of "EBITDA" that included "in the form and format used on Exhibit B." Among other things, Cornerstone argues that Valtech could not satisfy section 2.3.2's condition by using unaudited financial data to calculate EBITDA. Instead, according to Cornerstone, Valtech had to provide Cornerstone with its calculation demonstrating the amount of IPA owed using the financial data actually contained in Valtech S.E.'s consolidated audited financial statements as at December 31, 2015. In other words, Cornerstone argues Valtech S.E.'s 2015 audited financial statements had to show the amount equal to 4.2 times the EBITDA realized by Valtech during 2015 was greater than $1.9 million (the initial payment).

In support of its section 2.3.2 interpretation, Cornerstone contends the phrase "pursuant to the consolidated, audited financial statement of Valtech, S.E." can only mean that Valtech was required to determine EBITDA "for the specifically-defined 'Business,' as specifically measured by the 'consolidated audited financial statements of Valtech S.E., as at December 31, 2015'" and that the "EBITDA calculation should be supported by the consolidated audited financial statements in the general 'form and format' – as 'illustrated' by Exhibit B, with the same line items and basic calculation of earnings as measured before interest, taxes, and

depreciation." Because Valtech's operating income reported in its parent's consolidated audited financials was negative, Cornerstone argues it cannot owe any IPA. Cornerstone further asserts any other interpretation of section 2.3.2, including the one proffered by Valtech, is unreasonable.

Valtech, on the other hand, contends that Cornerstone's construction disregards the context in which the words "consolidated audited financial statements" appear. Valtech argues the reference to audited financial statements merely reflected the parties' intention that the EBITDA calculation for IPA purposes would not be done until after Valtech closed its books and submitted the year–end results to be audited as part of its parent company's consolidated audit. Valtech further asserts the APA required EBITDA to be calculated using the form and format used on Exhibit B to the APA, which illustrated the profit and loss statement of the Business, rather than from figures taken directly from its parent company's consolidated audited financial statements. Further, Valtech contends that because there was no EBITDA calculation for the "Business" in Valtech S.E.'s audited financials, it was impossible to calculate the IPA directly from the audited financials. Instead, the parties intended to measure the earnings from the specific assets Cornerstone purchased and required an IPA if those earnings exceeded the defined threshold.

We review questions of contract construction regarding an unambiguous contract de novo. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 449 (Tex.

–8–

2015). When parties dispute their contract's meaning, our primary concern is to ascertain the true intentions of the parties as expressed in the agreement. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743 (Tex. 2020). "In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls." *Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)); *see also URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757 (Tex. 2018) ("[O]bjective, not subjective, intent controls, so the focus is on the words the parties chose to memorialize their agreement.") (Internal quotation marks and footnote omitted). For these reasons, we "presume parties intend what the words of their contract say," *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010), and interpret contract language according to its "plain, ordinary, and generally accepted meaning" unless the instrument directs otherwise. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). In other words, we must "determine and enforce the parties' intent as expressed within the written agreement." *Piranha Partners*, 596 S.W.3d at 743.

The determination of whether a contract is ambiguous is also a question of law that we review de novo. *See URI, Inc.*, 534 S.W.3d at 763. Ambiguity does not exist simply because both parties present different interpretations of the agreement. *See Piranha*, 596 S.W.3d at 743–44. A determination of ambiguity requires that

both parties' interpretations be reasonable, and ambiguity will not exist if the language of the agreement creates a definite or certain legal meaning. *Id.* Our analysis considers the entire agreement, and to the extent possible, will resolve any conflict by harmonizing the agreement's provisions instead of applying arbitrary or mechanical default rules. *See id.*

After reviewing the language in question, we do not agree with Cornerstone that section 2.3.2 unambiguously requires that Valtech S.E.'s audited consolidated financial statements directly show the amount equal to 4.2 times the EBITDA realized by the Business during fiscal year 2015 was greater than Cornerstone's initial payment of $1.9 million. Contrary to Cornerstone's contention, the language "[i]f pursuant to the consolidated audited financial statements of Valtech S.E.," does not compel such a result. As recognized by Valtech, "pursuant to" merely means "in compliance with," "in accordance with," "as authorized by," or "in carrying out." *Pursuant to*, BLACK'S LAW DICTIONARY (8th ed. 2004); *see also Baty v. Bowen Miclette & Britt, Inc.*, 423 S.W.3d 427, 440 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (according to supreme court, "pursuant to" means "in carrying out") (citing *Syntax, Inc. v. Hall*, 899 S.W.2d 189, 191–92 (Tex. 1995)). Moreover, the APA defined EBITDA to mean "the operating income and depreciation, as illustrated on the profit and loss statement of the [seller's information technology, temporary staffing, recruiting and related staffing business] in the form and format used on Exhibit B." As noted by Valtech, the APA was for the purchase of certain assets,

not the business of Valtech Services as a whole. Accordingly, Valtech's construction that all section 2.3.2 required was for the raw data used in its EBITDA calculation be the raw data that Valtech provided to the auditors preparing its parent company's consolidated audited financials is in harmony with the rest of the parties' agreement.

Likewise, this construction allowed Valtech to update Exhibit "B" of the agreement to reflect the actual year-end total for office expenses rather than projections. Cornerstone's contention that the parent company's audited financial statements had to show that a specific EBITDA result had been achieved ignores the APA's definition of EBITDA, requiring operation income and depreciation, "as illustrated on the profit and loss statement of the Business in the form and format used on Exhibit B." Simply stated, the plain language of section 2.3.2 did not require that the specific EBITDA result be "specifically measured" by Valtech S.E.'s consolidated audited financial statements as at December 31, 2015 as Cornerstone contends.

In reaching our conclusion, we need not address whether audited financial statements are materially better than unaudited ones as Cornerstone asserts. Texas contract law enforces the plain terms of the parties' bargain, and section 2.3.2 did not require EBITDA to be calculated using the consolidated audited financial statements of Valtech, S.E. *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019) (courts must respect and enforce

terms of contract parties have freely and voluntarily made). As noted by Valtech, the APA specifically defines EBITDA as illustrated in the form and format used by Exhibit B, a profit and loss statement of the Business. We also reject Cornerstone's contention that the meaning of the phrase "in the form and format used on Exhibit B" as urged by Valtech is tantamount to "identical to" and forecloses the use of updated, year-end financial data (and thus section 2.3.2's requirement of audited financials).

Valtech's interpretation does not render the phrase "pursuant to the consolidated audited financial statement of Valtech, S.E." meaningless. As previously noted, when the parties closed their deal, Valtech had not yet closed its books or provided any data to its parent company's auditors. Accordingly, the phrase "pursuant to the consolidated audited financial statement of Valtech, S.E." required EBIDTA to be calculated on data provided to Valtech, S.E.'s auditors for its consolidated 2015 financials.

Cornerstone also argues Valtech's interpretation is unreasonable because Cornerstone already had access to Valtech's unaudited financial data at the time it signed the APA. But, as previously explained, year-end data was not yet complete and had not yet been submitted to Valtech S.E.'s auditors. Consequently, section

2.3.2 did provide Cornerstone with additional information that it did not have at the time of closing.

If the parties had intended Valtech, S.E.'s consolidated audited financial statements to show the EBITDA of the Business, or had the parties intended for the profit and loss statement in the form and format of Exhibit B to have been submitted to the Valtech, S.E.'s auditors, expressing that in words in the contract could have been easily done. However, according to the plain language of the agreement, the Business's operating income and depreciation (EBITDA) was calculated "as illustrated on [its] profit and loss statement . . . in the form and format used on Exhibit B." Section 2.3.2 did not alter this requirement. This construction is further reinforced by the last sentence of section 2.3.2 requiring the IPA be subject to Cornerstone's access to the books, records, and calculations of Valtech Services and its agents serving as the basis for the IPA. Because we conclude section 2.3.2 did not unambiguously require Valtech to calculate EBITDA from data contained within Valtech S.E.'s consolidated audited financial statements, we resolve Cornerstone's first issue against it.

In its second issue, Cornerstone contends that the evidence is legally insufficient to support the jury's finding that Valtech complied with the condition precedent. It specifically argues that: (1) Valtech's notice of the IPA due was untimely and (2) Valtech could not satisfy section 2.3.2's condition precedent

merely by using data Valtech supplied to Valtech's S.E.'s auditors to calculate the IPA.

Because Cornerstone challenges the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that there is no evidence to support the finding. *See Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). Evidence is legally sufficient to support a jury's verdict when it would allow reasonable and fair-minded jurors to reach the challenged finding. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing a finding for legal sufficiency, we consider the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See id.* Moreover, the unobjected-to jury charge sets the standard for our review of the evidence. *See Burbage v. Burbage*, 447 S.W.3d 249, 260 (Tex. 2014) (court's charge measures sufficiency of the evidence when opposing party fails to object to charge) (quoting *Osterberg v. Peca*, 12 S.W.3d 31, 55 Tex. 2000)). Here, the trial court instructed the jury that in order to find that Cornerstone failed to comply with section 2.3.2 of the APA, it must find that "Valtech Services complied with the condition imposed upon it under the APA." The jury was not instructed, however, on either party's interpretation of the condition set forth in section 2.3.2.

We first address Cornerstone's argument regarding Valtech's notice, assuming, without deciding, this issue was adequately preserved and briefed to this

–14–

Court.[10]   Cornerstone argues that because the only notice Valtech provided by April 15, 2016 demanded $1,791,524 but later sought a corrected, lesser amount, Valtech did not provide "proper notice" as required by section 2.3.2.   The undisputed evidence at trial revealed that Valtech provided a written demand for an IPA on April 11, 2016, which included a spreadsheet showing its EBITDA calculation in the manner set forth in Exhibit B as well as the math demonstrating an IPA was due. Section 2.3.2 did not require Valtech's notice to provide an EBITDA calculation free from any error to be effective.   Instead, all the section required was for Valtech to provide notice that the amount equal to 4.2 times the EBITDA realized in the 2015 fiscal year be greater than the Initial Payment of $1.9 million.   The last sentence of section 2.3.2 contemplated Cornerstone checking and reviewing Valtech's data and calculations for errors after notification.   Nothing in the section indicates that Valtech had to provide a correct calculation before April 15, 2016 before it would be entitled to any IPA.   Accordingly, the fact that Valtech subsequently reduced the amount it sought for IPA does not establish as a matter of law that Valtech's notice was untimely.

Having already rejected Cornerstone's argument that section 2.3.2 unambiguously required Valtech to calculate EBITDA directly from items in

---

[10] Valtech asserts that Cornerstone raises this notice issue for the first time on appeal and it was not preserved by Cornerstone's motion to disregard jury answers and for new trial.  It its motion, Cornerstone argued that "the only IPA demand Valtech made [prior to April 15, 2016] in the amount of $1,791,154 – was incorrect" and, "Valtech offered no excuse for its failure to timely demand an IPA of $1,203,309," which was the damages amount awarded by the jury.

Valtech, S.E.'s audited consolidated financials, we turn to the evidence to determine whether there was more than a scintilla of evidence to support Valtech's interpretation of section 2.3.2 that its EBITDA calculation was "pursuant to the consolidated audited financial statements of Valtech S.E., as at December 31, 2015."

There was testimony from Valtech's treasurer (CFO) Laurent Pretet that Valtech's EBITDA calculation for the IPA was constructed with the financial data from the accounting system. That same data was then reported in the consolidated financial statements. When asked whether it is that financial data that is audited in the audit, Pretet said "yes" and agreed that using that financial data is the same thing as using the audited financial statements 'because it's the same data."[11] He further stated that the auditors obtain the financial data from the consolidation software, Hyperion, and that the auditors did not find anything that needed a correction or an adjustment. Valtech's accountant, Scott Shaprio, also testified that he calculated EBITDA for purposes of calculating IPA by plugging Valtech's audited financial data into Exhibit B. He further indicated that he calculated the demand payment in accordance with the APA's definition of EBITDA. Valtech's chief operating

---

[11] Pretet testified, "So what Deloitte our auditor, or any auditing firm would do, they would do basically two things. They would ask a lot of questions and request a lot of documents. For example, if we report that we have made 1 million of sales, $1 million of sales, they would ask us for the list of all invoices for those sales. They would ask us to show the actual paper of the invoice to make sure that it exists, that we just didn't invent it. And they will check that the customers have paid us by checking the bank account and making sure that everything is paid." Pretet went on to state, "The second thing they will do, which is extremely important in an audit, is they will ask -- Deloitte will ask for what we call a third-party confirmation. To take an example, they will ask – they will send a letter to our customers asking them to confirm that they have purchased from us for a certain amount of services, and that amount that -- that the customer would report has to match with what we have reported."

officer, Tomas Nores, and Valtech's expert witness, Joe Galanti, both corroborated the accountant's testimony that Valtech calculated EBITDA in the manner provided by Exhibit B. Galanti further confirmed that Valtech's EBITDA calculation was in accordance with Valtech S.E.'s consolidated audited financial statements. We, therefore, conclude that there is legally sufficient evidence that Valtech complied with the APA's condition and that Valtech's EBITDA calculation was "pursuant to the consolidated audited financial statements" of Valtech, S.E. We resolve Cornerstone's second issue against it.[12]

In light of our disposition of Cornerstone's first two issues, we need not address Cornerstone's third issue, which is conditioned upon our reversal of the trial court's judgment with respect to Valtech's breach of contract claim.

CONCLUSION

Based on the record before us, we conclude the evidence was legally sufficient to support the jury's breach of contract finding.

---

[12] Valtech also addresses whether the evidence was factually sufficient to support the jury's finding. In it reply brief, however, Cornerstone clarifies that its appeal only presents a legal sufficiency issue about the effect of what it views as an unambiguous contract. Moreover, based on our resolution of Cornerstone's first and second issues, we need not address Valtech's alternative argument that the agreement is ambiguous.

–17–

Accordingly, we affirm the trial court's judgment.


        /David Evans/
        DAVID EVANS
        JUSTICE


190093F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CORNERSTONE STAFFING
SOLUTIONS, INC., Appellant

No. 05-19-00093-CV        V.

VALTECH SOLUTIONS, INC.
AND VALTECH SERVICES, INC.,
Appellees

On Appeal from the 116th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-16-10346.
Opinion delivered by Justice Evans,
Justices Partida-Kipness and Nowell
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Valtech Services, Inc. recover its costs of this appeal and the full amount of the trial court's judgment from appellant Cornerstone Staffing Solutions, Inc. and from XL Specialty Insurance Company as surety on appellant's supersedeas bond.

Judgment entered this 28th day of October 2020.